530 A.2d 74

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Dwight Cameron JOHNSTON, Appellant.**

Supreme Court of Pennsylvania.

Argued March 13, 1987.

Decided Aug. 5, 1987.

Reargument Denied Nov. 2, 1987.

Frank W. Ittel, Jr., Pittsburgh, for appellant.

David L. Cook, Dist. Atty., David A. Hepting, Robert F. Hawk, Asst. Dist. Attys., Butler, for appellee.

Before LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

Appellant was tried before the Court of Common Pleas of Butler County, Criminal Division for two violations of the

Controlled Substance, Drug, Device and Cosmetic Act. The court, sitting without a jury, convicted him of one count of possessing marijuana with intent to deliver, 35 P.S. § 780–113(a)(30) and one count of possession of marijuana, 35 P.S. § 780–113(a)(16). On November 1, 1984 the court sentenced appellant to five to ten months imprisonment followed by two years of probation on both counts, the sentences to run consecutively, plus a fine of $1,000 and costs. Cross appeals were filed to Superior Court, which vacated the sentence for simple possession and affirmed the sentence for possession with intent to deliver. 348 Pa.Super. 160, 501 A.2d 1119 (1985). Superior Court's rationale was that the crimes merged for sentencing purposes. Johnston petitioned for allowance of appeal and we granted allocatur to address the question of whether the evidence in this case was gathered pursuant to an illegal search and seizure.

On February 14, 1984 Special Agent David Munson of the Drug Enforcement Administration was present at the Rent-A-Space Warehouse near the intersections of Routes 19 and 228 in Butler County. While driving through this area, Munson observed a person carrying a package from one of the storage facilities to a parked car. Based on seventeen years of experience as a drug enforcement officer, Munson believed that the package he saw was a bale of marijuana. Shortly after this person put the package into the car, another person appeared from the same corridor of storage lockers, looked furtively in the officer's direction, and walked to the car carrying a similar package. The two then drove away. Munson identified the building as Building 4.

Munson then told local authorities that he believed drugs were being stored in the building where the two men had appeared at the Rent-A-Space facility. The next day, February 15, Officers from the Allegheny County Police Department, the State Bureau of Narcotics and Agent Munson went to the Rent-A-Space facility in order to check Building 4 with a police dog trained to sniff narcotics. The officers got permission from a representative of Rent-A-Space to take their trained scent dog into the corridor of Building 4

for the purpose of allowing the dog to sniff at the closed and locked doors of individual storage lockers.

The police dog was led into Building 4 and allowed to sniff at each of six doors in the corridor of that building. The dog "alerted" at locker number 47, indicating to its handler that locker 47 contained drugs. This information was given to Agent Charles Gahagan, of the Bureau of Narcotics Investigation and Drug Control, who was waiting outside the building. Upon checking Rent-A-Space records to identify the lessee of locker number 47, Gahagan found that one Dwight Johnston had signed the lease. Gahagan recognized Johnston as a person who had been arrested twice before on narcotics violations. Gahagan also talked with Agent Munson, who had originally seen the men carrying the suspected bales of marijuana, and Munson repeated what he had seen the day before. Agent Gahagan then composed an affidavit in support of a request for a search warrant, and a warrant was issued. The subsequent search revealed 15,406 grams, or almost thirty-four pounds of marijuana.

Appellant's first claim is that the presence of the drug-trained dog outside his storage locker constituted an illegal search under the Pennsylvania and United States Constitutions in that the dog was present without a warrant.[1]

Fundamentally, this claim rests on a concept which finds its origins in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) that there is a reasonable expectation of privacy which insulates citizens from certain types

---

1. The Fourth Amendment to the United States Constitution provides:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

   Article I, Section 8 of the Pennsylvania Constitution provides:
   The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

of police searches. In *Katz*, FBI agents attached an electronic listening and recording device to the outside of a public telephone booth and attempted to introduce into evidence the recorded conversation. Although the parties argued that the admissibility of the tape recorded evidence turned on whether the telephone booth was a constitutionally protected area, the Court declined to decide the case on this issue:

> the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

>      *      *      *      *      *      *

> No less than an individual in a business office, in a friend's apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment. One who occupies it, shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world. To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication.

389 U.S. at 351–2, 88 S.Ct. at 511, 19 L.Ed.2d at 582. *Katz*, then, teaches that when a person speaks or exposes an object to the public, whether he is in a private or a public place, he is not protected by the Fourth Amendment, but when he acts to keep speech or physical objects private, even in a public area, an unwilling disclosure *may* be forbidden by the Fourth Amendment.

Appellant's view is that the dog's sniffing, like the FBI's electronic surveillance, was impermissible without a warrant because it invaded his expectation of privacy in the storage locker under *Katz*. In neither case was there a physical invasion of enclosed space, and in both cases, police utilized devices (electronic and canine) to obtain information

which they were not able to obtain by using their own senses.

The most recent pronouncement of the United States Supreme Court on the Fourth Amendment status of police use of narcotics detection dogs appears in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In *Place* Miami police alerted New York drug enforcement authorities that a particular passenger, bound for New York, might be carrying illegal drugs. When the suspect arrived in New York, narcotics agents stopped him and seized his luggage for ninety minutes in order to take it to another airport and subject it to a "canine sniff" for narcotics. The Court held that the drugs which were found in the luggage were inadmissible on the grounds that the investigative seizure, which might be justified under the *Terry* doctrine,[2] was not justified in this case because of the length of time the luggage was detained. Presumably, the New York agents might have arranged to have a narcotics detection dog more closely at hand.

The *Place* Court also discussed the propriety of the use of the "canine sniff" as a drug detection procedure. A majority of the *Place* Court balanced an individual's interest in privacy and freedom from the embarrassment and inconvenience of police searches against the particular type of intrusiveness characteristic of a canine sniff for narcotics:

> The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick*, 433 U.S. [1] at 7, 53 L.Ed.2d 538, 97 S.Ct. 2476 [at 2481 (1977)]. We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. *Id.*, at 13, 53 L.Ed.2d 538, 97 S.Ct. 2476 [at 2484]. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging

2. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subject to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is sui generis. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

*Id.* at 707, 103 S.Ct. at 2645, 77 L.Ed.2d at 120–21.

Three dissenting members of the *Place* Court stated that the discussion of the use of narcotics detection dogs was dicta, since the case was simply decided by the determination that the prolonged seizure of the luggage went beyond an investigative stop authorized by *Terry*. Furthermore, Mr. Justice Brennan, joined by Mr. Justice Marshall, objected to an analysis which balanced the interests of the government against those of the individual in any context except the *Terry* context, where the brief stop is " 'to determine [the individual's] identity or to maintain the status quo momentarily while obtaining more information ...' " *Id.* at 715, 103 S.Ct. at 2649, 77 L.Ed.2d at 126:

There are important reasons why balancing inquiries should not be conducted except in the most limited circumstances. Terry and the cases that followed it established "isolated exceptions to the general rule that the

Fourth Amendment itself has already performed the constitutional balance between police objectives and personal privacy." ... "[T]he protections intended by the framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the 'often competitive enterprise of ferreting out crime'." ... The truth of this proposition is apparent when one considers that the Court today has employed a balancing test "to swallow the general rule that [seizures of property] are 'reasonable' only if based on probable cause." ... Justice Blackmun's concern over "an emerging tendency on the part of the Court to convert the Terry decision into a general statement that the Fourth Amendment requires only that any seizure be reasonable," ... is certainly justified.

*Id.* at 718–19, 103 S.Ct. at 2650–51, 77 L.Ed.2d at 128–29 (citations omitted). It is not the use of dogs, per se, that Justice Brennan objects to, but the prospect that, unlike a *Terry* stop, dogs might be used, according to the rule of *Place,* at random and with no requirement even of reasonable suspicion, much less probable cause, to seize property.

■ Although *Place* does not concern a canine sniff carried out on private property and directed at the closed door of a private area, we believe that the majority view of the United States Supreme Court would be that the canine sniff in the present case would not constitute a search. We reach this conclusion because of the importance the federal court attaches to the lack of intrusiveness of a canine sniff; because the disclosure of information as a result of the sniff is extremely limited; because the consequent embarrassment and inconvenience is minimal; and because although the appellant's parcels were not located in a public place, they were located near enough a public hallway that a trained dog, standing in that hallway could identify the odor of marijuana. Moreover, we conclude from *Place* that even if the majority's discussion is regarded as dicta, none-

theless, the view of a majority of the United States Supreme Court finds expression in the *Place* Opinion. We hold, therefore, that a canine sniff for contraband narcotics does not, under federal law, in the circumstances of this case, constitute a search.

We are left, however, with the question of whether the warrantless use of drug detection dogs in the corridors of leased storage areas is permitted under Pennsylvania law.

We agree with the dissenters in *Place* that a fundamental question in canine sniff cases is whether a balancing of interests is appropriate. As Mr. Justice Brennan points out in his *Place* dissent, the Fourth Amendment has already performed the constitutional balance between governmental interests and personal privacy, and *Terry* extended that balancing process only in special, limited circumstances. Basically, our determination must be whether we regard the present case as analytically similar to *Terry*, and therefore as appropriate for balancing police and individual interests, or whether the present case is so different from *Terry* that the balance has already been struck by the Fourth Amendment itself, and no further balancing should occur. Further, if we regard the case as analytically similar to *Terry*, we must then decide whether the balancing of interests, as in *Place*, results in a determination that a search did or did not occur; or whether, as in *Terry*, a search did occur but may be justified in certain circumstances without a warrant.

Critical to the *Terry* decision, of course, was that the police officer, who had seen what he regarded as suspicious behavior which signaled the possibility of an imminent criminal act, was called upon to act immediately and without a warrant. He had no time to write an affidavit and seek out a disinterested magistrate. Had he done so, it is likely that, by the time he returned with a warrant—assuming that a warrant were issued—the crime he feared was imminent would already have occurred and the suspects would have disappeared. On these facts, the United States Supreme Court held that a limited police inquiry and self-protective pat-down of outer garments of the person ques-

tioned was permissible under the Fourth Amendment. As Mr. Justice Brennan put it, *Terry* involves " 'necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure.' " *United States v. Place*, 462 at 712, 103 S.Ct. at 2647, 77 L.Ed.2d at 124 (dissenting opinion), citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In *Terry*, then, unlike *Place*, the Court held that there was a search, but that it was justified under the circumstances. In *Place*, the Court held that there was no search at all. The consequence of this holding, of course, is that police use of narcotics detection dogs in the context of *Place* facts need not be justified or explained under the Fourth Amendment.

We believe that the present case lacks the exigencies which were so important in *Terry*, and for that reason, the determination of whether there was a search cannot be made by balancing the privacy interests of the individual against the law enforcement objectives of government, and in this we disagree with the majority's analysis in *Place*. As Mr. Justice Brennan puts it, the balance has already been struck by the Fourth Amendment itself. The issue under Pennsylvania law, then, and contrary to *Place*, is not whether a search occurred, for it is our view that it did, but whether the search that occurred should implicate the usual warrant requirements characteristic of police searches of private areas. This question necessarily involves a balancing analysis. Thus, while we are unwilling to balance the privacy expectations of the individual against the law enforcement interests of government for the purpose of determining whether there was a search, we find the balancing inquiry appropriate to determine whether this particular kind of search in these circumstances necessarily implicates the fullblown warrant requirements of most other police searches. Professor LaFave puts the question this way:

If the issue is framed in terms of whether a totally unrestrained use of such dogs in a dragnet fashion would be tolerable in a free society, one's answer might likely be no. If so, then under the test earlier suggested as appropriate under *Katz,* such use of trained dogs to detect concealed contraband should be held to constitute a Fourth Amendment search. Yet it is clear that this particular surveillance technique amounts to a relatively minor intrusion upon privacy, much less than is involved, say, in the physical entry and ransacking of a house in an effort to find a quantity of narcotics. Because this is so, and because the use of trained dogs is a valuable surveillance technique which would be considerably hampered if it could be utilized only upon full probable cause and with search warrant in hand, from this perspective the push is in the direction of a holding that the use of trained dogs to detect concealed contraband is not a search. This quite obviously leads to the question of whether there is some Fourth Amendment middle ground, that is, whether it is possible to subject this law enforcement practice to *some* restraints so as to ensure that it is not used in a dragnet fashion or in a random or unprincipled fashion, but yet not destroy its effectiveness by imposing *all* the limitations which are applicable to other, more traditional kinds of searches that are much more threatening to privacy and security.

I Search and Seizure (2d Ed.) § 2.1(e), p. 315.

■ We believe that there is a Fourth Amendment middle ground applicable to the investigations conducted by police handlers of narcotics detection dogs. On the one hand, much of the law enforcement utility of such dogs would be lost if full blown warrant procedures were required before a canine sniff could be used; but on the other, it is our view that a free society will not remain free if police may use this, or any other crime detection device, at random and without reason. Accordingly, we hold that a narcotics detection dog may be deployed to test for the presence of narcotics, on the facts of this case where:

1. the police are able to articulate reasonable grounds for believing that drugs may be present in the place they seek to test; and

2. the police are lawfully present in the place where the canine sniff is conducted.

Our holding is based in part, on considerations not dissimilar to those stated in *United States v. Place:* a canine sniff-search is inherently less intrusive upon an individual's privacy than other searches such as wiretapping or rummaging through one's luggage; it is unlikely to intrude except marginally upon innocent persons; and an individual's interest in being free from police harassment, annoyance, inconvenience and humiliation is reasonably certain of protection if the police must have a reason before they may, in the circumstances of this case, utilize a narcotics detection dog.[3]

■ Applying this rule to the facts of this case, we conclude both that the police had and articulated a reasonable suspicion that drugs might be located within the storage building and that the police were lawfully situated when they conducted the canine search. Initially, police suspicion was aroused when DEA Agent Munson observed a person emerge from Storage Building Four carrying a parcel which Agent Munson, based on seventeen years of experience, believed to be a bale of marijuana. He explained that he could identify the parcel as suspected marijuana because of its size and shape. Bales of marijuana frequently are prepared in foreign countries using trash compactors, which produce bales of marijuana of the same approximate size and shape as the one appellant carried from his storage room.

3. We note our agreement with the United States Court of Appeals for the Ninth Circuit, which held:

the use of a canine's keen sense of smell to detect the presence of contraband within personal luggage *is* a Fourth Amendment intrusion, albeit a limited one that may be conducted without a warrant and which may be based on an officer's "founded" or "articulable" suspicion rather than probable cause

*United States v. Beale,* 674 F.2d 1327, 1335 (9th Cir.1982).

As to whether the police were lawfully situated at the time of the search, appellant argues that they were not because the hallway outside the storage locker "was restricted to those having business within the confines of the storage facility." The difficulty with appellant's position is that the police *did* have business within the storage facility; they were present with the permission of the facility's management; and the lease signed by the appellant gives the facility's management authority to enter to inspect the premises.[4] The police, therefore, were legally present in the hallway of the storage area when they made the search and they had a reasonable, articulated suspicion that illegal narcotics might be stored in Building Four, which justified the use of a narcotics detection dog. For these reasons, appellant's claim that the use of a narcotics detection dog violated the appellant's rights under the Pennsylvania Constitution must fail.[5]

Appellant's final claim is that the affidavit in support of the search warrant did not contain probable cause to believe that a crime had been committed at the storage facility which was to be searched. In particular, appellant asserts that the affidavit was deficient in three ways: (1) the issuing authority was given no information concerning the training and prior experience of the dog; (2) the affiant's knowledge of the appellant as a narcotics violator was stale; and (3) Agent Munson's observations of suspicious activity did not rise to the level of probable cause.

The standard by which we decide whether a warrant was properly issued is the totality of circumstances test, which we most recently described in *Commonwealth v. Baker*:

---

**4.** The lease, in pertinent part, provides:

> 7. INSPECTION. Tenant agrees that Lessor or his agent may at any reasonable time enter *to inspect the premises* or make repairs. (Emphasis added).

**5.** We are not called upon to decide in this case whether the same rules we have established today apply to a canine search of a person instead of a place; and we note also that should it become apparent that canine sniff searches are not reliable, either in a particular case or in general, the rationale of this Opinion would become invalid, for then the sniff search would become as intrusive as any other search.

The standard for evaluating whether probable cause exists for the issuance of a search warrant is the "totality of circumstances" test set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). This Court specifically incorporated this test into the law of the Commonwealth in the case of *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985), wherein we stated:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing] that probable cause existed."

513 Pa. 23, 26, 518 A.2d 802, 803–04 (1986). (Some citations omitted).

The search warrant in the present case contains the following affidavit of probable cause:

On Jan. 15, 1984 this Agent met with DEA Agent Frank Schmotzer relative to person(s) storing marihuana at the Rent-A-Space North Storage business, near Routes 228 & 19, Cranberry Twp. Butler County with mailing address of RD # 7 Box 1292 Mars, Pa. This Agent, (C. Gahagan) and Frank Schmotzer inquired with a representative of Rent-A-Space Storage and obtained permission from the representative to investigate storage room 4 47 Bldg. # 4 with a certified scent dog for the purpose of locating marihuana. Officer J. Start, Allegheny Co. Pa. Police used a K–9 (Shemp, 2½ year old male German Shepherd dog) to examine approx. six storage rooms in the vicinity of storage room 4 47 Bldg # 4. The dog, Shemp is a certified N.A.P.W.D.A. and was so certified as told to m[e] by Officer Start on 11/25/83. The dog, Shemp, alerted Officer Start to the door of 4 47 storage

room indicating to Ptl. Start the presence of Marihuana in 4 47 storage room. Your Affiant subsequently checked with the Storage business representative and learned that the suspect storage room 4 47 was rented by LEATHER LUGGAGE in the name of Dwight Johnston.

Your affiant then met with David H. MUNSON this same date and received the following information. David H. MUNSON is a special agent with D.E.A. and has been employed enforcing federal narcotics laws for 17 years. MUNSON stated that at approximately 4:10 p.m. on 1–14–84, he was driving through the rent a space facility at Route 19 & 228, Mars, Pa. S/A MUNSON observed a w/m exiting a corridor in building 4. The individual was carrying a parcel measuring approximately 30 × 12 × 18 inches and was wrapped in brown plastic. The parcel was placed by the person in the trunk of a light brown chevrolet which was backed up to the corridor. Because S/A MUNSON has considerable experience investigating marihuana smuggling he recognized the parcel to be similar to a marihuana bale. He observed the person to act suspiciously and evasive and did observe that he was coming from a locker on the North side of the corridor and closest to the East Driveway. After S/A Munson passed he observed another white male peering out of the corridor in an evasive manner toward the direction in which S/A Munson traveled. The second person emerged from the corridor carrying a similar parcel to the one described above.

After disappearing from their sight, S/A Munson walked back to the aforementioned location just as the Chevrolet vehicle left the area occupied by two males. S/A Munson walked to the rented storage space from which he had seen the two persons exit. S/A Munson was aided in locating the exact corridor by the tire tracks in the snow and by the melted snow where the Chevrolet's exhaust had been. S/A observed that the most Eastern door in that corridor on the North wall of the corridor bore the number 47.

Your affiant knows Dwight Johnston from previous narcotic investigations and knows that Dwight Johnston has been arrested on two occasions for violation of the Pa. CSDDC Act # 64 of 1972 as amended. Subject Johnston was arrested on 3–20–73 and 6–30–79 for those violations. It is the opinion of this affiant based on experience, knowledge, information received from S/A Munson and Pt. Start, and independent investigation that controlled substances, marihuana, are concealed within the above described room.

The items to be searched for are subject to seizure because they are contraband and their sale and possession constitute a violation of the Pa. CSDDC Act # 64 of 1972 as amended. Wherefore, based on the above information your affiant requests a Search Warrant be issued for the above described rent-a-space.

Breaking this affidavit down into its significant components, we have a police officer writing that another police officer with seventeen years experience in drug enforcement saw an individual the day before carry from an identified storage area a package with the shape and appearance of a bale of marijuana. A second person emerged from the same area carrying a bundle of the same size and shape. Both men behaved in a suspicious and evasive manner. Based on the suspicion of illegal narcotics activity indicated by this observation, "a certified scent dog" was brought to the storage area, and with the permission of the storage operators, was taken to the building from which the two men had carried the suspicious parcels, where the dog indicated the presence of marijuana in storage room 47. The person who rented storage room 47 had been arrested on narcotics charges twice before, once eleven years, and once five years before the affidavit was executed.

■ It is plain that if this information, taken together, is interpreted in the "common sense and realistic fashion" that is required by *Baker* and the cases which preceded it, the magistrate had probable cause to issue the warrant.

■ The only remaining question is whether the information about the dog and the matter of the prior arrests was properly before the magistrate. The claim that the dog was not adequately identified as a certified scent dog is without merit. The affidavit contains enough information to inform the magistrate that the animal used was not an ordinary police dog who might "alert" at anything, but instead was trained to indicate the presence of narcotics. To require that the affidavit indicate the school the dog attended and a breakdown of the searches in which the dog has been accurate and inaccurate would impose unreasonable burdens on the police. Unless it is established, as it has not been on this record, that trained narcotics detection dogs are less than 51% accurate, there is no need for a more detailed account of a narcotics detection dog's pedigree.

■ As to the use of arrests which were five and eleven years old, given the fact that this information involves the same type of criminal behavior that is at issue in the present case, and that it is being used only to corroborate other allegations in the affidavit, not as information which in itself was sufficient to establish probable cause, it was not error for the magistrate to consider this along with the other information in the affidavit. Moreover, even if the magistrate had disregarded this information, the affidavit would have contained enough to establish probable cause. Thus, appellant's second claim, also, is without merit.

The order of Superior Court is affirmed.

NIX, C.J., did not participate in the consideration or decision of this case.

McDERMOTT and HUTCHINSON, JJ., file a concurring opinion.

McDERMOTT, Justice, concurring.

I join only in the result.

The detection of an odor and the tapping of a public telephone are emphatically different things. One is a direct police action designed to invade the privacy one can expect

from the line for which they have paid. On the other hand if one cannot contain the odor of their business from seeping into the public domain they have betrayed their secret. If the odor proves the nature of the substance, and that substance is illegal contraband there is probable cause for a warrant. If the smeller, whether it is an experienced man, machine, trained dog, pig, or canary, can say upon training or experience that such an odor emanates from an illegal substance the warrant should issue. The other considerations are entertaining concepts for a world where people cannot die from what they smell.

HUTCHINSON, Justice, concurring.

I concur in the result reached by the majority. I find no reasons, however, to define a "canine sniff" as a search. I agree with the majority of the United States Supreme Court that such a sniff is "so limited both in the manner in which the information is obtained and the content of the information revealed ..." that it does not constitute a search for the purposes of the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). As I have previously stated, I fail to see why a different standard should be established under Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983) (Hutchinson, J., dissenting). There are no significant textual differences between these two constitutional provisions. *Compare* U.S. Const. amend. IV *with* Pa. Const. Art. 1, § 8. *See also Commonwealth v. Baker*, 513 Pa. 23, 518 A.2d 802 (1986) (applying *Gates* federal standard for probable cause for search warrant to Pennsylvania law). I am unpersuaded by the majority's policy reasons for establishing a different standard under our state constitution in this case.[1]

1. This Court has previously held that Article 1, § 8 of our State Constitution imposes standards for searches and seizures higher than those required by the Federal Constitution. *Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983) (Nix, C.J., for the majority); *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied, DeJohn v. Pennsylvania*, 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668

(1980). I find the reasons for this different standard to be equally unpersuasive in these opinions.