538 A.2d 570

COMMONWEALTH of Pennsylvania, Appellant,

v.

Brian Curtis FIORETTI, Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Raymond Gerard JOLIN, Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Karen K. POUST, Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Jeff Alan BARTON, Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Gregg Scott LULIS, Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Timothy Paul COLLEY, Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Donald E. GREINER, Jr., Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Charles Eugene YOUNG, Appellee.

COMMONWEALTH of Pennsylvania, Appellant,

v.

Delos E. WILLIAMS, Appellee.

Superior Court of Pennsylvania.

Argued Nov. 18, 1986.

Filed March 3, 1988.

536

Kenneth A. Osokow, Assistant District Attorney, Williamsport, for Com., appellant.

Stephen C. Sholder, Williamsport, for Fioretti, appellee (at 27HBG86).

Raymond Gerard Jolin, pro se.

William J. Miele, Williamsport, for Poust, appellee (at 92HGB86).

Timothy Paul Colley, pro se.

Donald E. Greiner, Jr., pro se.

Charles Eugene Young, pro se.

Robert M. Cravitz, Selinsgrove, for Lulis, appellee (at 108HBG86).

James T. Rague III, Mercer, for Barton, appellee (at 109HBG86).

John A. Felix, Williamsport, for Williams, appellee (at 164HBG86).

Before WIEAND, MONTEMURO and JOHNSON, JJ.

MONTEMURO, Judge:

In these consolidated appeals, the Commonwealth challenges various orders of the Lycoming County Court of Common Pleas granting appellees' motions to suppress all evidence obtained after their vehicles were stopped at various "sobriety checkpoint" roadblocks. The court of common pleas relied on this Court's opinion in *Commonwealth v. Tarbert*, 348 Pa.Super. 306, 502 A.2d 221 (1985),[1] and concluded that the sobriety checkpoints were *per se* unconstitutional. The court, therefore, suppressed all evidence obtained as a result of the stops made at the checkpoints.

---

1. *Commonwealth v. Tarbert*, 348 Pa.Super. 306, 502 A.2d 221 (1985), *aff'd on other grounds*, 517 Pa. ——, 535 A.2d 1035 (1987).

The roadblocks in question were conducted by the Williamsport Police Department on August 16, 1985,[2] September 8, 1985,[3] and September 14, 1985.[4]

Prior to reviewing the suppression orders, we must determine whether they are appealable. In *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985), our Supreme Court held that the Commonwealth may appeal a suppression order as long as the Commonwealth certifies in good faith that the suppression order substantially handicaps or terminates the prosecution. *Id.*, 506 Pa. at 545, 486 A.2d at 386. A prosecution is substantially handicapped whenever the "Commonwealth is denied the use of *all* their evidence," *id.* The Commonwealth's certification is "not contestable," and "[i]t, in and of itself, precipitates and authorizes the appeal." *Id. See also Commonwealth v. Hunsberger*, 358 Pa.Super. 207, 516 A.2d 1257 (1986) (*"Dugger* rule" applied). In the case before us, the Commonwealth has satisfied the certification requirement. We therefore find that the Commonwealth has an absolute right of appeal to this Court to challenge the validity of the nine suppression orders. We now turn to the merits of the Commonwealth's claims.

Given the Pennsylvania Supreme Court's recent decision in *Commonwealth v. Tarbert*, 517 Pa. ——, 535 A.2d 1035 (1987), and in its companion case, *Commonwealth v. Dannaker*, 517 Pa. ——, 535 A.2d 1035 (1987),[5] and the fact that

2. Appellee Jeff Alan Barton was stopped at a sobriety checkpoint roadblock on August 16, 1985 and was charged thereafter with driving under the influence of alcohol.

3. Appellees Brian Curtis Fioretti, Delos E. Williams, and Donald E. Greiner were stopped at a sobriety checkpoint on September 8, 1985 and were thereafter charged with driving under the influence of alcohol.

4. Arrested and charged with driving under the influence of alcohol as a result of being stopped at a sobriety checkpoint roadblock on September 14, 1985, were appellees Raymond Gerard Jolin, Karen K. Poust, Gregg Scott Lulis, Charles Eugene Young and Timothy Paul Colley.

5. For ease of reference, we will refer to the supreme court's single opinion addressing the appeals in both the *Tarbert* and *Dannaker* cases as the *Tarbert* decision. The *Tarbert* appeal raised the issue of whether systematic roadblocks are "violative of this state's constitu-

there are three different roadblocks involved in the consolidated cases now on appeal, we must answer the following questions: (1) Was the August 16, 1985 roadblock, wherein appellee Jeff A. Barton was stopped and subsequently charged with driving under the influence, unlawful for want of statutory authorization? (2) Was the September 8, 1985 sobriety checkpoint roadblock both authorized by the legislature and conducted in a constitutional manner? And (3) was the September 14, 1985 roadblock both authorized by the legislature and conducted in a constitutional manner?

With respect to question (1), we find that the August 16, 1985 roadblock was unlawful because it was not authorized by the legislature. We therefore affirm the court's suppression order in the *Barton* case. With respect to question (2), we find that the September 8, 1985 roadblock was both conducted in a constitutional manner and was authorized by the legislature. With respect to question (3), we do not have testimony of record concerning the manner in which the police conducted the September 14, 1985 roadblock.[6] We therefore remand the cases of appellees Jolin, Poust, Lulis, Young and Colley for a hearing to determine (a) whether the roadblock was conducted in a constitutional

tional prohibition against unreasonable searches and seizures." *Tarbert*, 517 Pa. at ——, 535 A.2d at 1037. The *Dannaker* appeal raised the issue of whether such roadblocks "are unlawful for want of specific statutory authorization." *Id.*

6. We have testimony concerning the particulars of only the September 8, 1985 roadblock. That testimony was offered in the suppression hearing in the case of *Commonwealth v. Fioretti*, No. 85–11–083, Criminal Division, Court of Common Pleas, Lycoming County (1985). In *Fioretti*, the court of common pleas, finding dispositive this Court's opinion in *Commonwealth v. Tarbert*, 348 Pa.Super. 306, 502 A.2d 221 (1985), held that sobriety checkpoint roadblocks were *per se* unconstitutional. Because the other eight cases that are now on appeal with *Fioretti* involved the same issue as that involved in *Fioretti*, no hearings were held in the other cases to determine the particulars of the roadblocks in question. Instead, the parties stipulated that there was no probable cause to arrest or reasonable suspicion to stop those individuals at the checkpoints. The parties in all eight cases stipulated that if checkpoints were held constitutional under certain circumstances, then the matters would be remanded to the court of common pleas for a determination of the constitutionality of the checkpoint procedure used and any additional issues raised in the motions to suppress.

manner, pursuant to the guidelines set forth by our supreme court in *Tarbert* and (b) any additional issues that were raised by appellees in their motions to suppress.

In *Tarbert, supra,* our supreme court addressed the question of whether "police may set up roadblocks for the purpose of stopping and observing drivers to determine whether they are operating a motor vehicle under the influence of alcohol." 517 Pa. at ——— ———, 535 A.2d at 1036. This Court had already addressed the issue in *Commonwealth v. Tarbert,* 348 Pa.Super. 306, 502 A.2d 221 (1985), and in *Commonwealth v. Dannaker,* 352 Pa.Super. 611, 505 A.2d 1030 (1985). In *Tarbert,* we concluded that such roadblocks violated Article I, Section 8 of the Pennsylvania Constitution, which prohibits unreasonable searches and seizures. In *Dannaker,* we found such roadblocks unlawful because there was a statute in effect at the time of the checkpoint in question that, by implication, prohibited such police conduct. *See* 75 Pa.C.S.A. § 6308(b). The supreme court in *Tarbert* affirmed our decisions in both cases but based its holding on the "statutory authorization" argument. The Court disagreed with our conclusion in *Tarbert* that such roadblocks violate the state constitution. The supreme court found systematic roadblocks conducted within certain prescribed parameters to be constitutional. However, the Court recognized that the "state legislature had statutorily restrained the power of the police to conduct roadblocks in connection with enforcing the motor vehicle laws." *Id.* 517 Pa. at ——, 535 A.2d at 1043. The Court concluded, therefore, that, pursuant to the 1983 version of section 6308(b) of the Motor Vehicle Code,[7] the roadblocks

---

7. The statute in effect when the police conducted the roadblocks in question in *Commonwealth v. Tarbert,* 517 Pa. ——, 535 A.2d 1035 (1987) and its companion case, *Commonwealth v. Dannaker,* 517 Pa. ——, 535 A.2d 1035 (1987), provided:

(b) **Authority of police officer.**—Whenever a police officer has *articulable and reasonable grounds to suspect a violation of this title,* he may stop a vehicle, upon request or signal, for the purpose of inspecting the vehicle as to its equipment and operation, or vehicle identification number or engine number, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

in question were unlawful because the police had exceeded their power by setting up the roadblocks.

■ We turn now to question (1) to determine whether the August 16, 1985 roadblock was lawful. In the nine consolidated appeals now before us, only one, *Commonwealth v. Barton*, No. 85-11-035, Lycoming Cnty., is expressly governed by the supreme court's decision in *Tarbert*. This is due to the fact that the 1983 version of 75 Pa.C.S.A. § 6308(b), which the supreme court found dispositive in its *Tarbert* decision, was in effect when Mr. Barton was stopped at a roadblock. The police had no "articulable and reasonable grounds to suspect a violation" of the Vehicle Code when they stopped appellee Barton. Therefore, the police exceeded their authority as delineated by the legislature in the statute. The statute was in effect until August 19, 1985, when an amendment to it became effective, which then allowed the police to conduct systematic roadblocks.[8] We therefore affirm the court's suppression order of February 3, 1986 in *Commonwealth v. Barton, supra.*

We turn to questions (2) and (3) to determine whether the roadblocks of September 8 and September 14, 1985 were both authorized by the legislature and conducted in a constitutional manner. The answers to these two questions are necessarily related because both roadblocks were conducted

75 Pa.C.S.A. § 6308(b), as amended 1983, July 22, P.L. 122, No. 32, § 4, imd. effective (emphasis added).

The statute was amended in 1985 to read:

(b) **Authority of police officer.**—Whenever a police officer *is engaged in a systematic program of checking vehicles or drivers* or has articulable and reasonable grounds to suspect a violation of this title, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S.A. § 6308(b), as amended 1985, June 19, P.L. 49, No. 20, § 10, effective in 60 days (emphasis added).

8. *See, supra,* footnote 7, for the text of the 1985 statute after the amendment of June 19, 1985, which was effective August 19, 1985.

after the effective date of the 1985 amendment to § 6308(b), which granted police the authority to engage "in a systematic program of checking vehicles and drivers."

■ We first examine the issue of whether the September 1985 roadblocks were conducted with legislative authorization. In *Tarbert*, the 1983 version of 75 Pa.C.S.A. § 6308(b) was in effect and did not permit police officers to stop cars without an "articulable and reasonable" suspicion that there was a violation of the Motor Vehicle Code. On that basis, the supreme court held that stops made pursuant to the roadblocks in question in *Tarbert* were unlawful. With respect to the eight appellees now before us who were stopped in September of 1985,[9] there had been an amendment to 75 Pa.C.S.A. § 6308(b) that was effective on August 19, 1985. The amended statute provided in pertinent part that "[w]henever a police officer *is engaged in a systematic program of checking vehicles or drivers* or has articulable and reasonable grounds to suspect a violation of this title, he may stop a vehicle, upon request or signal...." 75 Pa.C.S.A. § 6308(b) (effective August 19, 1985).[10] The amended statute authorized the police to conduct systematic stops without individual suspicion of illegal activity. *See Tarbert*, 517 Pa. at ——, 535 A.2d at 1034–35. We find therefore that the police were authorized by the legislature to operate the sobriety checkpoint roadblocks of September 8th and 14th, 1985.

■ Having resolved that the police action in conducting the September 1985 roadblocks was authorized by statute, we must now determine whether the roadblocks were conducted in a constitutional manner. However, we are limited in our ability to answer the constitutional question with regard to the September 14th roadblock because there is no evidence of record concerning the manner in which the

**9.** All appellees, with the exception of Jeff Alan Barton, were stopped at the September 1985 roadblocks. *See, supra,* footnotes 3 and 4.

**10.** For the full text of the statute as amended in 1985, see, *supra,* footnote 7.

police conducted the roadblock.[11] We therefore remand the cases of appellees Jolin, Poust, Lulis, Young and Colley, all of whom were stopped on September 14th, for a hearing on how the roadblock in question was conducted so the court of common pleas may make a determination on whether the roadblock was conducted in a constitutional manner. With respect to the September 8, 1985 roadblock, where appellees Fioretti, Williams and Greiner were stopped, we have a complete factual record detailing the procedure used by the police at the roadblock. But for this Court's decision in *Commonwealth v. Tarbert*, 348 Pa.Super. 306, 502 A.2d 221 (1985), finding such roadblocks *per se* unconstitutional, the court of common pleas in *Commonwealth v. Fioretti*, wherein the testimony concerning the roadblock was heard, would have found the roadblock procedure used to have been constitutional. Based on the supreme court's decision in *Tarbert*, we now conclude that the September 8, 1985 roadblock was conducted in a constitutional manner. Although the court based its decision in both *Tarbert* and *Dannaker* on a finding that the roadblocks exceeded the legislatively delineated police power under the 1983 version of 75 Pa.C.S.A. § 6308(b) (which had been amended to allow for systematic roadblocks by the time of the September 8th roadblock), the supreme court nonetheless addressed the constitutionality of such roadblocks. Because the Court's conclusion that roadblocks conducted according to certain guidelines are constitutional was unnecessary to the actual decision in *Tarbert*, it is *dicta*. Nonetheless, we are persuaded to follow and adopt this conclusion of the supreme court because it represents the view of a majority of the Justices of the Pennsylvania Supreme Court.[12]

**11.** *See, supra,* footnote 6, for an explanation of why the record is incomplete in this respect.

**12.** The supreme court's decision in *Tarbert* was not unanimous. One Justice joined Chief Justice Nix's plurality Opinion Announcing the Judgment of the Court. The Chief Justice concluded that, within prescribed guidelines, systematic roadblocks do not violate a motorist's right to be free from unreasonable searches and seizures pursuant to Article I, Section 8 of the Pennsylvania Constitution. However, the plurality actually based its decision on the fact that when the police

In the supreme court's plurality Opinion Announcing the Judgment of the Court, Chief Justice Nix recognized the Pennsylvania Constitution to be an alternative and independent source of rights from the Federal Constitution but, nonetheless, found the "large body of federal Fourth Amendment jurisprudence instructive." 517 Pa. at ——, 535 A.2d at 1038. The Chief Justice stated that it was no longer open to dispute that the "stopping of an automobile and the detention of its occupants is a seizure subject to constitutional restraints." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Common-*

conducted the roadblocks in question, they exceeded their authority as delineated by the legislature. Justice Zappala filed a concurring opinion. He found the roadblocks unconstitutional because the stops were conducted without probable cause. Justice Papadakos concurred in the result based on the plurality's analysis of the 1983 version of the statute. He declined to join Chief Justice Nix's opinion because he believed that the Court should and could have avoided the constitutional analysis. He did state, however, that he agreed with the plurality's conclusion that there is "constitutional justification for non-discriminatory, systematic roadblocks by police under well-defined parameters." 517 Pa. at ——, 535 A.2d at 1047 (Concurring Opinion, Papadakos, J.). Justice Flaherty concurred in the result but, unlike Justice Papadakos, offered no explanation for doing so. Justice Larsen dissented. He disagreed with the plurality's holding that the roadblock was unlawful. He found that the general statutes in effect at the time of the roadblocks in *Tarbert* and *Dannaker,* which established and defined the parameters of the police power, authorized such stops. By implication, Justice Larsen finds systematic roadblocks constitutional. Justice Larsen states, "I would hold that those charged with the responsibility of enforcing the Motor Vehicle Code may utilize any *reasonable* procedure upon our highways to achieve that goal so long as the procedure is not prohibited by the constitution, statute or precedent." 517 Pa. at ——, 535 A.2d at 1048 (Justice Larsen, dissenting) (emphasis in the original). Because he finds the roadblocks involved in both cases to be acceptable and would reverse the order of this Court in *Tarbert,* wherein we held the roadblocks to be unconstitutional, we can conclude, by implication, that Justice Larsen agrees with the plurality's finding concerning the constitutionality of systematic roadblocks. Former Justice Hutchinson did not participate in the *Tarbert* and *Dannaker* decisions. Of the six Justices who participated in the cases, four of them expressed the view that systematic roadblocks are constitutional.

*wealth v. Murray*, 460 Pa. 53, 331 A.2d 414 (1975); *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973)). Although, drivers and their passengers do not forfeit all reasonable expectations of privacy and may not be subjected to "unfettered governmental intrusion," 517 Pa. at ——, 535 A.2d at 1038 (citing *Deleware v. Prouse, supra*), the expectation of privacy in an automobile is significantly different from the expectation of privacy in one's home, 517 Pa. at ——, 535 A.2d at 1038. Moreover, automobiles, unlike homes, are subjected to extensive governmental regulation and control. *Id.*

Article I, Section 8 of the Pennsylvania Constitution prohibits "unreasonable searches and seizures." Chief Justice Nix noted in *Tarbert* that the United States Supreme Court, in construing the identical phrase, has "indicated that a finding of 'reasonableness' may, in limited circumstances, be predicated upon less than the traditional requirement of probable cause." *Id.* (citing *Delaware v. Prouse, supra*). The Chief Justice also recognized that the permissibility of a certain law enforcement practice is judged by balancing its intrusion on an individual's rights to be free from arbitrary invasions by government officials against its promotion of legitimate government interests. *Id.*, 517 Pa. at ——, 535 A.2d at 1039 (quoting *Delaware v. Prouse, supra*). The Chief Justice added that the Pennsylvania Supreme Court has expressly approved such a balancing-of-interests approach in some situations. *See Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987) (canine-sniff search).

In *Tarbert*, the supreme court of our Commonwealth addressed for the first time the issue of the constitutionality of police roadblocks. Our supreme court looked for guidance to *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), wherein the United States Supreme Court upheld the constitutionality of routine stopping of vehicles and questioning of their occupants at a permanent checkpoint established as part of a program to detect and apprehend illegal aliens. In *Mar-*

*tinez–Fuerte,* the Supreme Court applied the balancing-of-interests test and rejected the contention that there must be some reasonable suspicion that a vehicle contained illegal aliens before it could be stopped. The Court stressed the substantial public interest in detecting illegal aliens and believed the detection of illegal activity would be greatly hampered by the imposition of. a "reasonable suspicion" standard. 428 U.S. at 556–57, 96 S.Ct. at 3082–83. The Court also emphasized that the brief stop and questioning at the checkpoint were, objectively, minimally intrusive. *Id.* at 558, 96 S.Ct. at 3083.

In *Tarbert,* the Pennsylvania Supreme Court, in its plurality Opinion Announcing the Judgment of the Court, compared systematic police roadblocks for the detection of drunk drivers to the checkpoint at issue in *Martinez–Fuerte* and concluded that they shared many features. *See* 517 Pa. at ——–——, 535 A.2d at 1041 (quoting Note, *Curbing the Drunk Driver Under the Fourth Amendment: The Constitutionality of Roadblock Seizures,* 71 Geo.L.J. 1457, 1460–63 (1983) (quoted in 4 W. LaFave, *Search and Seizure* § 10.8(d), at 69–70 (2d ed. 1987)). The *Tarbert* plurality balanced the conflicting interests inherent in routine sobriety checkpoint roadblocks. On the one hand, the Court recognized the compelling interest of the state in protecting its citizens against drunk drivers. *Id.,* 517 Pa. at ——, 535 A.2d at 1042. It concluded that the government interest involved in the *Martinez–Fuerte* case, that of preventing illegal immigration, with its primarily economic impact, was not nearly as strong as the state interest in curbing drunk driving, with its potentially fatal consequences. *Id.* The Court reasoned that the public interest in preventing anyone under the influence of alcohol from operating a vehicle could not be met through traditional law enforcement procedures such as patrol and stops based on a *Terry* standard [13] because the police lack the personnel to conduct full scale patrols for drunk drivers. Further, the chances of detect-

---

**13.** Stops based on a *Terry* standard are based on an officer's reasonable suspicion that illegal activity is afoot. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

ing a drunk driver are lower when police patrol randomly as compared to when police use a sobriety checkpoint roadblock. *Id.*, 517 Pa. at ——–——, 535 A.2d at 1042 (quoting 4 W. LaFave, *supra,* § 10.8(d) at 72–73, and *Commonwealth v. Leninsky,* 360 Pa.Super. 49, 60–61, 519 A.2d 984, 990–91 (1986)).

The plurality concluded that, as to the privacy interests of the individual, the "intrusiveness, both objective and subjective, of a drunk-driving roadblock can be reduced to a constitutionally acceptable degree by the manner in which it is managed and conducted." 517 Pa. at ——, 535 A.2d at 1043. The Court therefore set out the following guidelines to ensure the constitutionality of a sobriety checkpoint roadblock:

> [T]he conduct of the roadblock itself can be such that it requires only a momentary stop to allow the police to make a brief but trained observation of a vehicle's driver, without entailing any physical search of the vehicle or its occupants. To avoid unnecessary surprise to motorists, the existence of a roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made knowable in advance. The possibility of arbitrary roadblocks can be significantly curtailed by the institution of certain safeguards. First, the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection it is essential that the route selected for the roadblock be one which, based on local experience, is likely to be travelled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. Additionally, the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision.

517 Pa. at —————, 535 A.2d at 1043. The plurality concluded that in its view "a drunk-driver roadblock conducted substantially in compliance with the above guidelines would reduce the intrusiveness to a degree which, when balanced against the compelling public interest in apprehending such drivers, would not violate Article I, section 8 of the Pennsylvania Constitution." *Id.*, 517 Pa. at ——, 535 A.2d at 1043.

With those guidelines in mind, we now focus our attention on the particulars of the roadblock conducted on September 8, 1985. According to the testimony of Williamsport police officer Sergeant Mayers, who drafted the procedure used at the roadblock, the plans and procedure were authorized by the chief of police of Williamsport. (N.T., Suppression Hearing, *Commonwealth v. Fioretti*, December 12, 1985, at 6–7). The specific roadblock conducted on September 8, 1985, also was approved by the chief of police. *Id.* at 7. The time of the roadblock was established based on statistical information indicating when the highest number of drunk-driving accidents and arrests occurred. *Id.* at 36. The September 8th roadblock was conducted between 12:40 a.m. and 3:20 a.m. *Id.* at 36. The location of the roadblock was chosen based on an evaluation of drunk-driving arrests in the fifteen districts comprising the Williamsport Police Department's territory. *Id.* at 7, 36. The department chose to set up a roadblock somewhere within District 13, which had a disparately high number of drunk-driving arrests between February 1, 1984 and August 8, 1985. *Id.* at 8, 35. The actual location within the district was chosen for its safety features: a straight roadway, no cross streets, a wide berm, two lanes, good lighting, and a concrete barrier dividing the two flows of traffic travelling in opposite directions. *Id.* at 8, 12–14. There were signs warning motorists of the "sobriety checkpoint" ahead. *Id.* at 11. Moreover, a local newspaper had published an article a few days prior to the weekend notifying the public that the police would be conducting a sobriety checkpoint that weekend at an unspecified location and time. *Id.* at 20. The police were conducting themselves in accordance with a

written procedure approved by the chief of police. *Id.* at 16. All checkpoint officers had a copy of the procedure. *Id.* All cars were stopped that were heading east, thus removing discretion from the checkpoint officers concerning whom to stop. *Id.* at 18, 23. The only discretion exercised by the police would be in deciding whether to discontinue the checkpoint if the traffic backed up. *Id.* at 15. The average wait in line before coming into contact with a checkpoint officer was about 1 and ½ to 2 minutes; and, if the checkpoint officer detected no signs of alcohol consumption, the average contact with the officer was 15 to 30 seconds. *Id.* at 23. The officers were instructed to be unobtrusive, greet the occupants of the vehicle, tell them the purpose of the stop and, if the officers observed no signs of driving under the influence, to allow the vehicle to proceed. *Id.* at 17. If the officer suspected the driver was under the influence of alcohol, the officer would question the driver further or perhaps administer a horizontal-gaze-nystagmus test[14] to the driver while the driver remained seated in the car. *Id.* at 28. Only drivers who exhibited signs of intoxication after further questioning were asked to pull over to the berm and were given a preliminary breath test. *Id.* at 25. After taking a breath test, the drivers were asked to perform certain field sobriety tests. *Id.* at 26. If drivers failed both the breath and field sobriety tests, they were taken to the hospital for blood alcohol tests. *Id.* at 30.

Applying the guidelines set forth in *Tarbert* to the facts at bar, we find that the September 8, 1985 roadblock was conducted in a constitutional manner. It involved only a momentary stop; drivers were adequately forewarned of its existence; the decision to hold a roadblock and the procedure used was approved by the chief of police of Williamsport; the location of the roadblock was chosen based on a statistical analysis of which district had the highest number

---

**14.** The horizontal-gaze-nystagmus test involves holding an object such as a finger or pen in front of a subject's face and having the subject hold his or her head still while following the object from side to side with the eyes only. The procedure tests the subject's ability to focus.

of driving under the influence arrests or accidents and the time was determined on a similar statistical basis; and all cars were stopped, thus removing discretion from the checkpoint officers concerning whom they would stop.

Therefore:

(1) We affirm the suppression order in the appeal of *Barton* pursuant to the supreme court's opinion in *Tarbert* and its interpretation of the 1983 version of 75 Pa.C.S.A. § 6308(b).

(2) To the extent that we find that the September 8, 1985 roadblock was both constitutional and lawful, we reverse the suppression orders involved in the *Fioretti* and *Williams* appeals. However, appellees Fioretti and Williams have both raised issues in their motions to suppress in addition to the constitutionality and legality of the roadblock. Because no hearing has been held on these additional issues, we remand these two cases for a hearing on those additional issues raised in the motions to suppress. With respect to the suppression order in *Commonwealth v. Greiner,* we reverse. In both his original motion and in his amended motion to suppress, appellee Greiner raises no issues beyond the legality and constitutionality of the September 8th roadblock. Because we have already determined all issues raised by Mr. Greiner in his motion, we see no reason to remand the case for further hearing.

(3) With respect to the appeals by appellees Jolin, Poust, Lulis, Young and Colley, we remand for a hearing to determine (a) the constitutionality of the September 14, 1985 roadblock pursuant to the guidelines established by the supreme court in *Tarbert* and (b) the merit of any other issues raised in the appellees' motions to suppress.

Affirmed at No. 109 Hbg. 1986 (*Commonwealth v. Barton* ).

Reversed at No. 141 Hbg. 1986 (*Commonwealth v. Greiner* ).

Remanded for proceedings consistent with this opinion at No. 027 Hbg. 1986 (*Commonwealth v. Fioretti* );

No. 063 Hbg. 1986 (*Commonwealth v. Jolin*);
No. 092 Hbg. 1986 (*Commonwealth v. Poust*);
No. 108 Hbg. 1986 (*Commonwealth v. Lulis*);
No. 140 Hbg. 1986 (*Commonwealth v. Colley*);
No. 142 Hbg. 1986 (*Commonwealth v. Young*); and
No. 164 Hbg. 1986 (*Commonwealth v. Williams*).

Jurisdiction is relinquished.