**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Mark S. WORTHY.**

Superior Court of Pennsylvania.

Argued Oct. 25, 2005.

Filed June 29, 2006.

James R. Gilmore, Asst. Dist. Atty., Pittsburgh, for Com., appellant.

Martin W. Sheerer, Pittsburgh, for appellee.

BEFORE: FORD ELLIOTT, TODD, and POPOVICH, JJ.

OPINION BY FORD ELLIOTT, J.:

¶ 1 In this appeal, the Commonwealth challenges the October 19, 2004 order of the Court of Common Pleas of Allegheny County granting Mark S. Worthy's ("Worthy") motion to suppress evidence obtained after his vehicle was stopped at a sobriety checkpoint roadblock.[1] The trial court held that the checkpoint at issue failed to adhere to the *Tarbert–Blouse* criteria.[2] We agree and affirm.

■ ¶ 2 When we review the Commonwealth's appeal from the decision of the suppression court, "[we] consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradict-

---

1. This appeal is permissible as the Commonwealth has certified in good faith that the suppression order submitted for our review substantially handicaps the prosecution and the appeal is not intended for delay purposes. Pa.R.A.P. 311(d); *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985).

2. *Commonwealth v. Tarbert,* 517 Pa. 277, 535 A.2d 1035 (1987) (plurality); *Commonwealth v. Blouse,* 531 Pa. 167, 611 A.2d 1177 (1992).

ed." *Commonwealth v. Nester*, 551 Pa. 157, 160, 709 A.2d 879, 880–81 (1998). "When the evidence supports the suppression court's findings of fact ..., this Court may reverse only when the legal conclusions drawn from those facts are erroneous." *Commonwealth v. Valentin*, 748 A.2d 711, 713 (Pa.Super.2000).

¶ 3 The Commonwealth presents the following issue for our review:

Did the suppression court err in concluding that the police operating the DUI sobriety checkpoint pursuant to 75 Pa.C.S.A. § 6308(b), which stopped every vehicle that approached, acted improperly in opening the checkpoint at times when traffic backed-up to allow motorists to pass through the checkpoint before resuming the checkpoint operations of stopping every vehicle?

Commonwealth's brief at 4.

■ ¶ 4 Worthy was charged with driving under the influence of alcohol, §§ 3731(a)(1) and (a)(4)(*l*), after he was stopped during a sobriety checkpoint on May 25, 2002 in Monroeville, Pennsylvania. Worthy filed an omnibus pre-trial motion and a motion to dismiss; he claimed that the roadblock conducted on May 24, 2002 through May 25, 2002 was unconstitutional and, therefore, any evidence obtained from the stop must be suppressed.

¶ 5 A suppression hearing was held on April 13, 2004 wherein Sergeant Ronald H. Harvey ("Sergeant Harvey") testified that he was the checkpoint coordinator for the regulatory roadblock in question. (Notes of testimony, 4/13/04 at 4.) Sergeant Harvey met with the administration of the police department as to where, when, and why the checkpoint would be held. He presented information to show the history of the roadway as far as the number of accidents and DUI arrests that had occurred in that area. (*Id.*) The sobriety checkpoint was approved by Assistant Chief Doug Cole; the following memorandum was entered into evidence:

You are hereby authorized to post notice and arrange for officers to work a sobriety check point the night of the 24th of May, 2002. The check point details shall start at 2300 hours, the 24th of May, 2002, and conclude no later than 0400 hours on the 25th of May, 2002. As per our conversation on the 15th of May, 2002, our review of the state accident statistics regarding drinking and driving accidents and our department records showing the number of traffic stops resulting in driving under the influence arrests, you are authorized to set up a check point on Route 22 westbound at Roomful Express, 3651 William Penn Highway in Monroeville, PA. If circumstances would prevent you from using that primary location, you are authorized to move to 2420 Moss Side Boulevard, State Route 48 in Monroeville.

*Id.* at 6.

¶ 6 Sergeant Harvey explained that the checkpoint began at approximately 11:40 p.m. (*Id.* at 7.) The officer involved in the checkpoint posted large orange signs several hundred feet up the road which were lit by traffic flares and lights. (*Id.* at 7–8.) The signs advised drivers of an imminent checkpoint ahead. He also stated that every vehicle, without exception, was to be stopped. (*Id.* at 8.) However, "when the traffic got heavy and there was an unreasonable delay, we opened the checkpoint and let all the traffic flow. At that point, no traffic was checked." (*Id.*) Sergeant Harvey stated that there were three different occasions where he opened the checkpoint. (*Id.* at 9.)

¶ 7 Following the hearing, the court ordered briefs from both parties. Argument on the briefs was held during an October 6, 2004 hearing. Based on the evidence

adduced from the hearing, the trial court concluded that the prosecution failed to satisfy its burden of proving that the sobriety checkpoint was constitutional; on October 19, 2004, the court filed an order granting Worthy's suppression motion. The Commonwealth filed a timely appeal along with the Rule 1925(b) statement ordered by the court.

■ ¶ 8 It is well settled that the stopping of an automobile and the detention of its occupants is a seizure subject to constitutional restraints under the United States and Pennsylvania Constitutions.[3] *Commonwealth v. Fioretti*, 371 Pa.Super. 535, 538 A.2d 570 (1988). "However, if the police follow specified procedures, systematic, non-discriminatory, non-arbitrary roadblocks for the purpose of insuring safety on the highways have been deemed constitutional." *Commonwealth v. Ziegelmeier*, 454 Pa.Super. 330, 685 A.2d 559, 561 (1996) (citation omitted). The authority to conduct a systematic roadblock in Pennsylvania is statutorily authorized. 75 Pa.C.S.A. § 6308(b).[4]

¶ 9 In *Tarbert, supra*, a plurality of our supreme court set forth guidelines to insure that an investigative roadblock is acceptable. Specifically, our supreme court indicated the following:

First, the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection it is essential that the route selected for the roadblock be one which, based on local experience, is likely to be traveled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. *Additionally, the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards prefixed by administrative decision.*

*Id.* (emphasis added). *See Blouse, supra* at 173, 611 A.2d at 1180 ("We now adopt the guidelines set forth in *Tarbert*, because they achieve the goal of assuring that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."). *See also Ziegelmeier*, 685 A.2d at 562, quoting *Tarbert, supra*. The *Blouse* court also held that "[s]ubstantial compliance with the guidelines is all that is required to reduce the intrusiveness of the search to a constitutionally acceptable level." *Blouse, supra*.

¶ 10 With these particulars in mind, we now focus our attention on the instant checkpoint to determine if it was conducted in a constitutional manner. Again, the trial court found the checkpoint did not comply with the fifth guideline; rather, that the question of which vehicles to stop was not established by objective standards prefixed by administrative decision. (Trial court opinion, 2/4/05 at 3.) We agree.

---

**3.** The Fourth Amendment to the United States Constitution and Article 1, § 8 of the Pennsylvania Constitution protect against unreasonable searches and seizures.

**4.** Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title. 75 Pa.C.S.A. § 6308(b).

¶ 11 At the suppression hearing, testimony was presented concerning the manner in which the police conducted the roadblock. The memorandum which authorized the plans and procedure for the checkpoint was entered into evidence. The testimony presented revealed that each vehicle was stopped "[e]xcept for when the traffic got heavy and there was an unreasonable delay, we opened the check point and let all the traffic flow. At that point, no traffic was checked." (Notes of testimony, 4/13/04 at 8.) The checkpoint was opened at three different times during its operation. (*Id.* at 9.)

¶ 12 We agree with the trial court that "the guidelines of *Tarbert–Blouse* were not complied with as there was no prefixed administrative decision with objective criteria describing when to suspend the checkpoint to allow traffic to flow through." (Trial court opinion, 2/4/05 at 4.) The memorandum authorizing this checkpoint made no mention of when the checkpoint could be temporarily stopped due to traffic flow. Additionally, no testimony was presented as to how Sergeant Harvey came to the conclusion that the traffic was backed-up to the point that the operation needed to be suspended. For instance, Sergeant Harvey did not testify as to how many cars were stopped on the roadway at the times he suspended the checkpoint. Nor did he explain the criteria that was used in making the decision to begin checking vehicles again. No testimony was presented to indicate that the traffic stoppage posed safety problems for the citizens or officer involved. *See, e.g., Tarbert, supra* at 290, 535 A.2d at 1041.

¶ 13 Therefore, we find that the record supports the trial court's conclusion that the checkpoint was controlled by the arbitrary discretion of the officers working that evening rather than established procedures governing the operation of the roadblock. Again, "[a] central concern in balancing the opposing interests is protecting the individual from arbitrary invasions at the unfettered discretion of officers in the field." *Blouse, supra* at 170, 611 A.2d at 1178. Sergeant Harvey had "the unfettered discretion of when to suspend the checkpoint and when to resume the checkpoint." (*Id.* at 4–5.) Such arbitrary decisions can be curtailed significantly by the institution of a safeguard; the very decision of how many cars are backed-up should be reserved for prior administrative approval, thus removing the determination from the discretion of the police officers in the field. *See Tarbert, supra* at 293, 535 A.2d at 1043.

¶ 14 The Commonwealth argues that the police did not act with "unfettered discretion" when the officers temporarily stopped the operation of the checkpoint when traffic backed-up and that every vehicle was stopped while the checkpoint was operating. (Appellant's brief at 11, 12, 16.) Rather, the Commonwealth claims that the temporary nature of the suspended operation of the checkpoint was to alleviate delay in compliance with the first guideline— that the stop be momentary in nature. "Authority to make on the scene decisions to temporarily suspend operations is a necessary function of the police to effectuate a properly run checkpoint." (*Id.* at 18.) The Commonwealth, however, is unable to refer this court to any case or administrative authority supporting this proposition.

¶ 15 The Commonwealth asserts that the officers substantially complied with the requirements. Relying primarily on *Fioretti, supra,* and *Commonwealth v. Pacek,* 456 Pa.Super. 578, 691 A.2d 466 (1997), the Commonwealth maintains that our courts have allowed officers discretion with regard to temporary checkpoint shutdowns for delay reasons. The facts in *Pacek* involved a checkpoint that was stopped

three or four times when the traffic became "backed-up" and restarted when conditions permitted. *Pacek, supra* at 468 n. 2. The main issue in *Pacek,* however, concerned notice and the ability of the police to operate the checkpoint without allowing motorists to avoid it. Although a footnote in the case indicates that the checkpoint was stopped and started three times, there was no indication that this was not previously authorized before the checkpoint began.

¶ 16 The Commonwealth also cites to *Fioretti, supra,* and suggests that this court approved the proper discretion of police "to discontinue the checkpoint if the traffic backed up." *Fioretti,* however, is easily distinguishable as the police conducted their actions in accordance to a written procedure approved by the chief of police. *Id.* at 576–577. The written procedure provided the officers with the requirement to stop all vehicles heading east, with discretion to decide whether to discontinue the checkpoint if traffic backed-up. There was no indication in *Fioretti* that the checkpoint was stopped and started; rather, the court indicated that "all cars were stopped, thus removing discretion from the checkpoint officers concerning whom they would stop." *Id.* at 577.

¶ 17 Here, the Commonwealth failed to establish that there was a prefixed, objective standard for suspending and resuming the sobriety checkpoint on the night in question. We find that the trial court properly suppressed the evidence.

¶ 18 Order affirmed.

¶ 19 TODD, J. files a Concurring Statement.

CONCURRING STATEMENT BY TODD, J.:

¶ 1 I join the majority opinion because, under the *Tarbert–Blouse* guidelines, I agree the Commonwealth failed to demonstrate that the decisions regarding which vehicles to stop were "in accordance with objective standards prefixed by administrative decision" and not left to the "unfettered discretion" of the police officers at the scene. *Commonwealth v. Blouse,* 531 Pa. 167, 172, 611 A.2d 1177, 1180 (1992) (quoting *Commonwealth v. Tarbert,* 517 Pa. 277, 293, 535 A.2d 1035, 1043 (1987) (plurality)). I do so reluctantly, however, because I observe that there is no suggestion in the record that the officer in this case, in periodically alleviating traffic congestion by temporarily suspending the checkpoint, was doing anything other than attempting to fulfill his duty to ensure that traffic flow was managed as safely and as efficiently as possible.

¶ 2 Nevertheless, the *Tarbert–Blouse* guidelines are in place because a constitutional right is at stake. The guidelines exist not because we presume police officers are incapable of properly exercising discretion at checkpoints such at the one at issue in this case, but because the limited exception to the constitutional requirement of probable cause to effect a seizure, permitted by *Tarbert* and *Blouse,* is so extraordinary that it may be allowed only under the most exacting standards. The guidelines "achieve the goal of assuring that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Blouse,* 531 Pa. at 173, 611 A.2d at 1180. Thus, the question of which vehicles to stop—which question necessarily includes the issue of when to temporarily suspend stopping vehicles for whatever reason—must conform to prefixed, objective standards. Because I agree those standards were not met in this case, I join the majority.