957 A.2d 720

**COMMONWEALTH. of Pennsylvania, Appellant**

v.

**Mark S. WORTHY, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 10, 2007.

Resubmitted Jan. 14, 2008.

Decided Oct. 27, 2008.

472

Michael Wayne Streily, Allegheny County District Attorney's Office, for Com.

Martin W. Sheerer, Sheerer & Associates, Pittsburgh, for Mark S. Worthy.

Before CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice McCAFFERY.*

In this matter of first impression, we granted allowance of appeal to consider whether the temporary suspension of a police sobriety checkpoint to relieve traffic congestion, conducted pursuant to the on-site officer's discretion, complied with the dictates of the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution, as explicated by this Court's precedent. We hold that it did and, therefore, reverse the Superior Court and remand to the trial court for further proceedings.

The relevant facts of the instant case are not in dispute. On May 15, 2002, administrative officials of the Monroeville Police Department authorized a sobriety checkpoint for State Route 22 in Monroeville, Allegheny County, also known as the William Penn Highway. This location was chosen because of its high incidence of motor vehicle accidents and arrests for violations of the driving-under-the-influence (DUI) statutes. The memorandum of authorization for the checkpoint provided as follows:

* This matter was reassigned to this author.

You are hereby authorized to post notice and arrange for officers to work a sobriety checkpoint the night of the 24th of May, 2002. The checkpoint details shall start at 2300 hours, the 24th of May, 2002, and conclude no later than 0400 hours on the 25th of May, 2002. As per our conversation on the 15th of May, 2002[;] our review of the state accident statistics regarding drinking and driving accidents[;] and our department records showing the number of traffic stops resulting in driving under the influence arrests, you are authorized to set up a checkpoint on Route 22 westbound at Roomful Express, 3651 William Penn Highway in Monroeville, Pa. If circumstances would prevent you from using that primary location, you are authorized to move to 2420 Moss Side Boulevard, State Route 48 in Monroeville.

Memorandum of Authorization from Assistant Chief Doug Cole to Sergeant Ronald Harvey, dated 5/15/02 (read into Notes of Testimony Suppression Hearing (N.T.), 4/13/04, at 5–6).

On the night of May 24, 2002, on a long straight-away of Route 22, Sergeant Ronald Harvey and other police officers established the sobriety checkpoint as authorized by the memorandum. The officers posted large orange signs, illuminated with traffic flares and lights, several hundred feet in advance of the checkpoint. The checkpoint was visible to approaching motorists from approximately one-half mile away, and the officers stopped every vehicle. However, on three occasions when the traffic was heavy, resulting in an unreasonable delay, Sergeant Harvey temporarily suspended operation of the checkpoint and let all traffic pass through without stopping. During these pauses, the officers did not stop any cars. When the traffic abated, the officers resumed checkpoint operations and again began to stop every vehicle. N.T. at 7–9 (testimony of Sergeant Harvey).

Appellee Mark S. Worthy was driving one of the vehicles stopped by an officer at the checkpoint. Based on the officer's determination that Appellee exhibited bloodshot eyes and slurred speech and emitted a strong smell of alcohol, the

officer administered three field sobriety tests, all of which Appellee failed. Appellee also failed a breath test. The officer arrested Appellee and charged him with two DUI offenses.[1]

Appellee filed an omnibus pretrial motion to suppress evidence obtained as a result of the stop at the sobriety checkpoint, contending that his rights under both the United States and Pennsylvania Constitutions to be free from unreasonable searches and seizures were violated because the sobriety checkpoint was not conducted in accordance with the guidelines promulgated by this Court in *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177 (1992), and *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987) (plurality) (hereinafter the *"Tarbert–Blouse* guidelines"). In particular, Appellee argued that because the administrative approval for the checkpoint failed to delineate any fixed criteria as to the circumstances under which the checkpoint could be temporarily suspended and then restarted, it conferred upon the on-site officers unfettered discretion concerning which vehicles to stop, in conflict with the *Tarbert–Blouse* guidelines.

The trial court conducted a suppression hearing on April 13, 2004, during which the only witness was Sergeant Harvey, the individual who had obtained authority for and then supervised the sobriety checkpoint. Sergeant Harvey testified that on three occasions during the operation of the checkpoint he had made a decision to "open the checkpoint and let traffic flow" in order to "avoid unreasonable delay for the traffic that was in line." N.T. at 9. After reviewing the parties' briefs, the trial court granted Appellee's suppression motion, concluding that, although the officers had the authority to stop every vehicle that came through the checkpoint, they did not have the

1. Specifically, Appellee was charged with 75 Pa.C.S. §§ 3731(a)(1) and 3731(a)(4)(i), which prohibited, respectively, driving under the influence of alcohol to a degree that rendered the person incapable of driving safely, and driving with a blood-alcohol level of 0.10 % or greater. *See Commonwealth v. Hess*, 570 Pa. 610, 810 A.2d 1249, 1251 & n. 1 (2002). Subsequent to Appellee's arrest, Section 3731 was repealed and replaced by 75 Pa.C.S. § 3802. *See* Act of September 30, 2003, P.L. 120, No. 24, § 14, effective February 1, 2004. The repeal and reenactment have no relevance to the issue presented here.

authority or the discretion to stop and then restart the checkpoint. In the trial court's words, "[t]he authority to conduct the checkpoint [as granted in the Memorandum of Authority] did not include authority to suspend the checkpoint when traffic backed-up." Trial Court Opinion, dated 2/4/05, at 3–4. The trial court further explained its logic as follows: "[T]he sobriety checkpoint did not satisfy the *Tarbert–Blouse* requirements because the question of which vehicles to stop at the checkpoint and which vehicles to allow to proceed through when traffic backed-up [sic] was left to the unfettered discretion of the police officers at the scene. There was no pre[-]fixed administrative decision with objective criteria of when to suspend the sobriety checkpoint to allow traffic to flow through." *Id.* at 3.

The Commonwealth appealed, pursuant to Pennsylvania Rule of Appellate Procedure 311(d).[2] The Superior Court affirmed the ruling of the trial court, concluding that the decision to suspend temporarily and then resume the sobriety checkpoint was controlled by the arbitrary and unfettered discretion of the officers at the scene, rather than by established administrative procedures. *Commonwealth v. Worthy*, 903 A.2d 576, 580 (Pa.Super.2006). The Superior Court advised that "the very decision of how many cars [must be] backed-up [in order to suspend temporarily the checkpoint] should be reserved for prior administrative approval, thus removing the determination from the discretion of the police officers in the field." *Id.* In sum, in the Superior Court's view, "the Commonwealth failed to establish that there was a pre[-]fixed, objective standard for suspending and resuming the sobriety checkpoint," and therefore the evidence obtained as a result of Appellee's being stopped at the checkpoint was properly suppressed. *Id.* at 581.[3]

2. As required to take an appeal as of right under Pa.R.A.P. 311(d), the Commonwealth certified that the suppression order substantially handicapped the prosecution of the case.

3. Judge (now Madame Justice) Todd filed a concurring opinion in which she joined the majority opinion "reluctantly." She noted that "there is no suggestion in the record that the officer in this case, in periodically alleviating traffic congestion by temporarily suspending the

We granted the Commonwealth's petition for allowance of appeal to address the following issue:

> Did the Superior Court and the suppression court err in concluding that suppression was warranted because the written administrative authority for the sobriety checkpoint did not specify when the checkpoint might be temporarily shut down due to traffic back-up?

Commonwealth's Brief at 4.[4]

 When the Commonwealth appeals from a suppression order, we consider only the evidence of the defense and the evidence of the Commonwealth that remains uncontradicted when read in the context of the entire record. *Commonwealth v. Gaul*, 590 Pa. 175, 912 A.2d 252, 254 (2006), *cert. denied*, —— U.S. ——, 128 S.Ct. 43, 169 L.Ed.2d 242 (2007). At the suppression hearing in the instant case, the only evidence presented was the testimony of Sergeant Harvey, who testified for the Commonwealth. Sergeant Harvey's testimony was uncontested and uncontradicted. Thus, no relevant facts are in dispute, and the question presented for this Court is purely one of law. Accordingly, our standard of review is *de novo*. *Commonwealth v. Beaman*, 583 Pa. 636, 880 A.2d 578, 581 (2005).

 Although the stopping of a motor vehicle at a sobriety checkpoint constitutes a seizure for constitutional purposes, such checkpoint stops are not *per se* unreasonable, and

checkpoint, was doing anything other than attempting to fulfill his duty to ensure that traffic flow was managed as safely and as efficiently as possible." *Worthy, supra* at 581 (Todd, J., concurring). However, Judge Todd also stressed that "the limited exception to the constitutional requirement of probable cause to effect a seizure, permitted by *Tarbert* and *Blouse*, is so extraordinary that it may be allowed only under the most exacting standards." *Id.* She concluded that the need for pre-fixed, objective standards as to which vehicles to stop was not met in the instant case, and accordingly she joined the majority opinion. *Id.*

4. We have reworded the Commonwealth's issue for clarity. The Commonwealth also raised, in the alternative, a second issue: Whether the suppression of evidence resulting from the sobriety checkpoint was a proper remedy. Because of our resolution of the first issue, we need not address the second issue.

hence are not *per se* unconstitutional under either the Fourth Amendment to the United States Constitution or Article I, Section 8 of the Pennsylvania Constitution.[5] *See Beaman, supra* at 581–85 (summarizing the development of decisional law in this area and citing, *inter alia, Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), and *Blouse, supra* ). In *Sitz,* the United States Supreme Court concluded that sobriety checkpoints do not offend the Fourth Amendment because they are a reasonable means of advancing a vital public interest, involving only a modest intrusion on the privacy and liberty of motorists. *Sitz, supra* at 451–55, 110 S.Ct. 2481 (discussed in *Beaman, supra* at 583). Similarly, we have held that systematic, non-discriminatory, non-arbitrary checkpoints do not offend the Pennsylvania Constitution.[6] *Blouse, supra* at 1180; *see also Beaman, supra* at 585 (explaining *Blouse* ).

In *Blouse,* we formally adopted guidelines to ensure that checkpoints are carried out in a constitutionally acceptable manner. *See Blouse, supra* at 1180 (expressly adopting the guidelines set forth in *Tarbert, supra* ). The guidelines adopted are as follows:

> The conduct of the roadblock itself can be such that it requires only a **momentary stop** to allow the police to make a **brief but trained observation** of a vehicle's driver, without entailing any physical search of the vehicle or its occupants. To avoid unnecessary surprise to motorists, the existence of a roadblock can be so conducted as to be ascertainable from a reasonable distance or otherwise made

**5.** The Fourth Amendment to the United States constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Article I, Section 8 of the Pennsylvania Constitution provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures." Pa. Const. Art. I, § 8.

**6.** Although we have held that Article I, Section 8 affords greater individual privacy protection than does the Fourth Amendment, we have also concluded that this distinction does not compel a different result with regard to the constitutionality of sobriety checkpoints under state law as compared to federal law. *See Beaman, supra* at 583–85 (citing *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991)).

knowable in advance. The possibility of arbitrary road-blocks can be significantly curtailed by the institution of certain safeguards. First[,] the very decision to hold a drunk-driver roadblock, as well as the decision as to its time and place, should be matters reserved for prior administrative approval, thus removing the determination of those matters from the discretion of police officers in the field. In this connection it is essential that the route selected for the roadblock be one which, based on local experience, is likely to be travelled by intoxicated drivers. The time of the roadblock should be governed by the same consideration. Additionally, **the question of which vehicles to stop at the roadblock should not be left to the unfettered discretion of police officers at the scene, but instead should be in accordance with objective standards pre[-]fixed by administrative decision.**

*Blouse, supra* at 1180 (quoting *Tarbert, supra* at 1043) (emphasis added).

In other words, to be constitutionally acceptable, a checkpoint must meet the following five criteria: (1) vehicle stops must be brief and must not entail a physical search; (2) there must be sufficient warning of the existence of the checkpoint; (3) the decision to conduct a checkpoint, as well as the decisions as to time and place for the checkpoint, must be subject to prior administrative approval; (4) the choice of time and place for the checkpoint must be based on local experience as to where and when intoxicated drivers are likely to be traveling; and (5) the decision as to which vehicles to stop at the checkpoint must be established by administratively pre-fixed, objective standards, and must not be left to the unfettered discretion of the officers at the scene. *See id.*

We adopted the above guidelines because they "achieve the goal of assuring that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* In addition, we concluded that "[s]ubstantial compliance with the guidelines is all that is required to reduce the intrusiveness of the search to a constitutionally acceptable level." *Id.* (citing *Tar-*

*bert, supra* ). We note our agreement with Justice Eakin's concurring opinion in so far as it emphasizes that substantial—and not complete—compliance with the guidelines is all that is required under *Tarbert–Blouse*.

In the instant case, the Superior Court, in agreement with the trial court, held that the sobriety checkpoint at issue did not comply with the fifth and final *Tarbert–Blouse* guideline, *i.e.,* the need for pre-fixed, objective standards for determining which vehicles to stop. *Worthy, supra,* 903 A.2d at 579. More specifically, the Superior Court determined that the supervising police officer had "unfettered discretion" as to when to suspend the checkpoint due to traffic back-up and when to resume operation. It is undisputed that, on three occasions during the evening of the checkpoint, Sergeant Harvey, the supervising officer, opened the checkpoint to allow all the traffic to pass through unimpeded in order to alleviate a traffic back-up. It is also undisputed that the administrative authorization for the checkpoint did not specifically set forth criteria by which Sergeant Harvey would determine when traffic was sufficiently backed up such that temporary suspension of the checkpoint was warranted. Based on these undisputed facts, the Superior Court, as well as the trial court, inferred that the decision as to which vehicles to stop at the checkpoint was controlled by the arbitrary discretion of the officers at the scene and not by pre-fixed objective standards. We cannot agree with this inference, as explained below.

Critical to our resolution is the fact that when the checkpoint was in operation, **every** vehicle was stopped to allow the officers to briefly observe the driver. Only when the traffic volume became heavy and the resulting back-up caused an unreasonable delay did Sergeant Harvey temporarily suspend operation of the checkpoint and allow **every** vehicle to pass through unimpeded. Such a temporary suspension and resumption of checkpoint operations occurred only three times during the course of the evening. There was no allegation— much less any evidence—that Sergeant Harvey or any other police personnel, based the decision as to when to suspend or

when to resume operation of the checkpoint on the character-istics or actions of any particular vehicle or driver.[7] Rather, Sergeant Harvey's uncontradicted and uncontested testimony indicated that he ordered suspension, followed by resumption of the checkpoint, based on his experience and trained obser-vations of the traffic conditions at the location of the check-point. Thus, while Sergeant Harvey did exercise his informed and knowledgeable discretion regarding when to suspend and when to resume the checkpoint, neither he nor any other officer exercised **any** discretion as to which vehicles to stop when the checkpoint was in operation because all vehicles were stopped at such times. Contrary to the Superior Court and the trial court, we cannot conclude that this procedure violated the *Tarbert–Blouse* proscription against placing unfet-tered discretion with the on-site officers as to which vehicles to stop at the checkpoint.

An on-site officer's determination as to when to sus-pend or when to resume a checkpoint must be controlled by two general requirements: to ensure safety and to keep any delay in passing through the checkpoint reasonable. Consid-erations of safety, both for the public and the officers, must be paramount in the operation of a checkpoint. With regard to the second requirement, the *Tarbert–Blouse* guidelines specify that a checkpoint should necessitate only a "momentary stop" for a "brief ... observation" of each vehicle's operator, in order to keep the intrusion to a minimum. *Blouse, supra* at 1179–80. An unreasonable delay in passing through the checkpoint would constitute more than a minimal intrusion, and accordingly must be avoided. The police officers at the scene are ultimately responsible for ensuring both that any delay in passing through the checkpoint is reasonable and that

7. Of course, constitutional constraints would be violated if the tempo-rary suspension and resumption of a checkpoint were used to circum-vent the requirement that a checkpoint be systematic, non-discriminato-ry, and non-arbitrary, with objective pre-fixed standards governing which cars are stopped. But that is not the issue presented here. We emphasize that in the instant case there is not an iota of evidence that Sergeant Harvey or any other police officer suspended or resumed checkpoint operations for improper reasons, and indeed Appellee did not allege such conduct.

the checkpoint is conducted safely. Accordingly, the officers must have the authority to exercise sufficient discretion on the scene to allow them to fulfill these responsibilities. Discretion so severely limited by the requirements of maximum safety and minimum delay is **not** unfettered.

There is no question that delays to the traveling public as well as safety challenges can result from swift and unexpected changes in traffic conditions in the vicinity of a checkpoint (or anywhere else, for that matter). Furthermore, it is obvious that many factors influence traffic volume and flow through a checkpoint, such as the characteristics of the roadway, including the number of traffic lanes, the presence or absence of traffic lights and intersections, and posted speed; the nature of the adjacent real estate, and whether it is rural or urban, business or residential; environmental conditions, including weather and light intensity or glare; the number and experience of the officers on the scene; and any unexpected or emergency event along or in the roadway, such as a motor vehicle accident or passing ambulance. The officers on the scene must continually observe and evaluate the net effect of all the interacting influences on traffic volume and flow through the checkpoint. The officers on the scene are the only ones who can integrate the effect of all the conditions on the ground and make an informed and educated decision as to when traffic conditions require temporary suspension of a checkpoint to ensure that safety is paramount and delay is reasonable.[8]

8. In *Commonwealth v. Fioretti*, 371 Pa.Super. 535, 538 A.2d 570, 577 (1988), the Superior Court held constitutional a checkpoint procedure in which "[t]he only discretion exercised by the police would be in deciding whether to discontinue the checkpoint if the traffic backed up." In the instant case, the Superior Court attempted to distinguish *Fioretti* by noting that the *Fioretti* checkpoint procedure was in written format, approved by the chief of police. *Worthy, supra* at 581. We cannot accept the Superior Court's reasoning. Specifically, we do not deem it determinative that the memorandum authorizing the checkpoint at issue in the instant case failed to include a sentence providing that police had the discretion to suspend the checkpoint if the traffic backed up. Such very general language does not provide any real guidance or delineate any relevant factors to aid in the exercise of the granted discretion, but merely—and without any helpful explanatory

We reject the Superior Court's suggestion that the decision as to when to suspend a checkpoint can be reduced to a single, quantitative, pre-determined standard, *i.e.,* the specific number of vehicles backed up behind a checkpoint. *See Worthy, supra* at 580. While such a standard may appear "objective," it does not and cannot incorporate all of the complexities involved in assessing traffic conditions for the criteria of ultimate importance here, *i.e.,* minimizing delay and maximizing safety around a checkpoint. Requiring officers to count the number of vehicles approaching the checkpoint on a continual basis, and then to rely primarily on this quantitative measure in deciding when to suspend operations, would constitute an ill-advised and unnecessary distraction from the responsibility at hand: *i.e.,* conducting a sobriety checkpoint safely, efficiently, and with only reasonable delay to the traveling public.

In sum, we hold that on-site police officers may exercise their discretion to suspend temporarily the operation of a sobriety checkpoint because of traffic back-up that has created unreasonable delay or safety concerns. The exercise of such discretion during the operation of a checkpoint is not in conflict with the *Tarbert–Blouse* guidelines, and accordingly offends neither the Fourth Amendment to the United States Constitution nor Article 1, Section 8 of the Pennsylvania Constitution.

Reversed and remanded to the trial court for proceedings consistent with this opinion. Jurisdiction relinquished.

Mesdames Justice TODD and GREENSPAN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE files a concurring opinion.

Justice EAKIN files a concurring opinion.

Justice SAYLOR files a dissenting opinion in which Mr. Justice BAER joins.

detail—provides authorization for the officers to use their training, experience, and common sense in deciding when to suspend the checkpoint for heavy traffic.

## CONCURRING OPINION

Chief Justice CASTILLE.

I join Mr. Justice McCaffery's learned Majority Opinion in its entirety. I write only to express some supplemental thoughts on why I believe there is no basis for suppression in this case.

What this case reveals, more than anything else, is an unavoidable deficiency in the constitutional rules courts are called upon to fashion. The guidelines set forth in *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (1987) (plurality) and *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177 (1992) were adopted in the context of particular cases and controversies, and the facts of those cases necessarily acted to limit the comprehensiveness of the constitutional rule fashioned going forward. This case has revealed an uncontemplated (though it now looks predictable) real-world complication.

Mr. Justice Saylor's Dissenting Opinion states that traffic back-up at a checkpoint is "*sui generis,* in that it is always a foreseeable condition, as it stems from the nature of the activities that take place there[.]" Dissenting Op. at 488, 957 A.2d at 730. I agree that this case has revealed that fact. Notably, however, traffic buildup was not so foreseeable as to be factored into the *Tarbert–Blouse* guidelines. Going forward, I would have no difficulty with adopting the Dissenting Opinion's perfectly reasonable view that, in the administrative authorization for future roadblocks, there can and should be some provision for the contingency that revealed itself—and revealed a gap in our rule—in the crucible of this case—a contingency that, I agree, will likely be common with roadblocks. But I would not fault the police here, who tried to adhere to the rule then in existence, and then acted reasonably in the face of a contingency we had not accounted for. Police did not seek to skirt the rule we fashioned: the *Tarbert–Blouse* guidelines were followed to the letter and, as all agree, the police here acted in good faith.

The fact of the incompleteness of our existing rule, and police good faith do, I believe, implicate the question of

whether suppression should be deemed available. The central command of the Fourth Amendment, and Article I, Section 8, is reasonableness. Where police follow the existing case decisional guideline, and act reasonably in the face of an uncontemplated factor, I see no basis for suppression. In my judgment, the roadblock in this case having been properly authorized, and the stop having been reasonably conducted under the circumstances, the windfall of suppression should not be made available.

## CONCURRING OPINION

Justice EAKIN.

I join the majority's opinion concluding the *Tarbert–Blouse* guidelines were met, and agree the Superior Court's decision should be reversed.

I write separately because the majority opinion may be read to construe the guidelines as an exclusive five-factor test to determine if a DUI checkpoint is constitutional. *See* Majority Op., at 477–79, 957 A.2d at 724–25. However, each DUI checkpoint is distinct in time, place, law enforcement personnel involved, duration, safety needs, *etc.* Therefore, these guidelines should not be interpreted as five mandatory factors; they should properly be utilized as a non-exclusive list, identifying some important and specific factors that should be analyzed in every case.

Further, the majority apparently concludes "substantial compliance" with the guidelines occurs when all five factors are met. *Id.*, at 477–83, 957 A.2d at 724–27. If all five factors must be met, this would be "*complete* compliance" with the guidelines, not merely "*substantial* compliance" as *Blouse* requires. *Commonwealth v. Blouse*, 531 Pa. 167, 611 A.2d 1177, 1180 (1992). As each checkpoint is necessarily unique, "substantial compliance" will vary with each case; in some cases, meeting four of the five factors could be "substantial compliance." In other cases, substantially, but not completely, meeting all five factors could be deemed "substantial compliance."

This interpretation of the guidelines better meets basic constitutional jurisprudence. The totality of the circum-

stances, not an exclusive laundry list of factors, is reviewed to determine if probable cause exists to conduct a search or seizure, *Commonwealth v. Hernandez*, 594 Pa. 319, 935 A.2d 1275, 1284 (2007) (citations omitted) (search); *Commonwealth v. Clark*, 558 Pa. 157, 735 A.2d 1248, 1252 (1999) (citations omitted) (seizure). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). Likewise, reasonable suspicion for a *Terry*[1] stop is also evaluated under the totality of the circumstances. *Commonwealth v. Revere*, 585 Pa. 262, 888 A.2d 694, 707 (2005). Therefore, I do not think evaluating the constitutionality of a stop via a DUI checkpoint, as opposed to a stop based on reasonable suspicion or probable cause, should be evaluated solely on five enumerated factors, but should be evaluated under the totality of the circumstances.

## DISSENTING OPINION

Justice SAYLOR.

Because I would hold that the Constitution requires that administrative guidelines be established in advance in order to channel the decision as to whether and when to suspend and resume checkpoint operations due to traffic congestion, I respectfully dissent.

As the majority observes, the stopping of a vehicle and its occupants constitutes a seizure for purposes of both the Fourth Amendment, *see City of Indianapolis v. Edmond*, 531 U.S. 32, 40, 121 S.Ct. 447, 453, 148 L.Ed.2d 333 (2000), and Article I, Section 8 of the Pennsylvania Constitution, *see Commonwealth v. Blouse*, 531 Pa. 167, 169, 611 A.2d 1177, 1178 (1992). Thus, the legality of such a stop depends on whether it is "reasonable" in a constitutional sense. As this Court explained in *Commonwealth v. Beaman*, 583 Pa. 636, 642, 880 A.2d 578, 582 (2005), although some measure of

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

individualized suspicion is ordinarily required for any stop to be deemed constitutionally reasonable, an exception exists "where regimes of suspicionless searches or seizures are designed to serve governmental 'special needs' that exceed the normal demands of law enforcement," *id.* at 643, 880 A.2d at 582; *see id.* at 643 n. 7, 880 A.2d at 582 n. 7 (collecting cases), including the need to reduce roadway deaths, injuries, and property damage caused by drunk driving. *See id.* at 644, 880 A.2d at 583. *See generally Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 455, 110 S.Ct. 2481, 2488, 110 L.Ed.2d 412 (1990). Even in these cases, however, the need to utilize a roadblock to serve a vital governmental interest is weighed against the intrusion upon the individual's reasonable expectation of privacy. *See Delaware v. Prouse,* 440 U.S. 648, 654–55, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979). In this regard, the elements of the *Tarbert–Blouse* standard, as recited by the majority, are designed to minimize interference with individual liberty by "eliminating the discretion that is problematic in random traffic stops." *Blouse,* 531 Pa. at 171, 611 A.2d at 1179.

Thus, in accordance with the *Tarbert–Blouse* guidelines, it is necessary that the discretion of the officers at the scene concerning which vehicles to stop, and which to let through without stopping, be subject to administratively pre-approved objective standards, which both minimizes the discretion of the officers at the scene and enhances the reviewability of any such discretion that ultimately is exercised. *Cf. United States v. Martinez–Fuerte,* 428 U.S. 543, 559, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976) (contrasting roving patrols with highly visible roadblocks, and observing that the unreviewable nature of the officers' discretion inherent in the former is constitutionally problematic). *See generally State v. Damask,* 936 S.W.2d 565, 573–74 (Mo.1996) ("A constitutionally permissible checkpoint will be designed so as to minimize both interference with legitimate traffic and the amount of discretion the field officers may wield in operating the checkpoint."); *Commonwealth v. Worthy,* 903 A.2d 576, 581 (Pa.Super.2006) (Todd, J., concurring) (expressing that the limited exception to

the constitutional requirement of probable cause to effectuate a seizure "is so extraordinary that it may be allowed only under the most exacting standards"). The existence of such guidelines safeguards Fourth Amendment and Article I, Section 8 values by curtailing the potential for pretextual checkpoint suspensions and resumptions designed to circumvent the applicable neutral criteria governing which cars to stop.[1]

I recognize that a number of contingencies may occur during the operation of a roadway checkpoint, such as an auto accident or some other emergency that diverts officers' attention away from operating the roadblock itself. It may not be feasible for a written administrative authorization to provide guidance concerning every such eventuality, and I would not hold that the Constitution demands as much. Traffic buildup at the checkpoint, however, is *sui generis*, in that it is always a foreseeable condition, as it stems from the nature of the activities that take place there—most notably, the systematic interruption of normal traffic flow to check for signs of intoxication. Further, establishing parameters to guide officers in determining when to pause, and when to resume, operations, appears to be a relatively straightforward undertaking, whether it is accomplished as part of the administrative authorization for the particular roadblock in question, or in some other way. In the present case, there were no such parameters available to the checkpoint supervisor, and—as is evident from the suppression transcript—this left him with no objective standards to consult in deciding when to suspend and resume operations. In this regard, although the majority

1. The majority concedes that a constitutional violation would ensue if temporary checkpoint suspensions were used pretextually to effect discriminatory stops, but emphasizes that "there is not one iota of evidence" that the supervising officer engaged in such conduct in the present case. Majority Opinion, at 481 n. 7, 957 A.2d at 726 n. 7. With respect, I believe this assertion misses the point. The guidelines apply to all suspicionless roadway checkpoints as a means of ensuring generally that motorists' constitutional rights are protected, and it is illegal for the police to fail to comply with them even in instances where there is no evidence of actual misconduct. Thus, the issue is not whether any misconduct occurred, but whether the relevant constitutional principles require prior administrative guidelines for temporary pauses in checkpoint operations.

is legitimately concerned with ensuring that the officers on the scene are able to protect motorists' safety and minimize their delay, *see* Majority Opinion, at 480–83, 957 A.2d at 726–27, I see no reason why it would be difficult to address these concerns and simultaneously protect drivers' constitutional rights through administratively-adopted suspend/resume guidelines established before the fact.

As highlighted by the majority and by then-Judge (now Madame Justice) Todd, there is nothing on this record to indicate that the supervising officer's actions were undertaken in anything other than good faith. For purposes of the present constitutional analysis, however, the salient fact is that he was required to exercise his own unbridled discretion in determining how much congestion would have to build to require remediation, when conditions would again be deemed "normal," and (necessarily) which cars would be the last and first to be stopped before and after waving vehicles through. As one of our sister Courts has stated:

> The requirement of written guidelines [for systematic roadway checkpoints] is not merely a formality. Rather, it is the method this Court and others have chosen to ensure that the police do not act with unbridled discretion in exercising the power to stop and restrain citizens who have manifested no conduct that would otherwise justify an intrusion on a citizen's liberty.

*Campbell v. State,* 679 So.2d 1168, 1172 (Fla.1996); *cf. State v. Larson,* 485 N.W.2d 571 (Minn.Ct.App.1992) (finding a checkpoint unconstitutional because of excessive officer discretion, where officers lacked sufficient administrative authorization for the roadblock and followed a "stop when safe" rule in deciding which cars to detain). Because, in my view, the checkpoint operation, in effect, failed to conform to the requirement that officers not be left with "unfettered discretion" to determine which cars to stop at the scene, I would conclude that it did not substantially comply with the final element of the *Tarbert–Blouse* guidelines. As such, I would hold that the stop in question violated Appellee's right to be free from unreasonable searches and seizures under both the Fourth

Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

The majority also notes its agreement with Mr. Justice Eakin's position that "substantial—and not complete—compliance" with the *Tarbert–Blouse* guidelines is all that is constitutionally required. Majority Opinion, at 479–80, 957 A.2d at 725. The majority's expression in and of itself might be unremarkable, as this Court previously has couched the constitutional mandate in terms of "substantial compliance." *See, e.g., Commonwealth v. Yastrop,* 564 Pa. 338, 348, 768 A.2d 318, 323 (2001) (plurality); *Blouse,* 531 Pa. at 173, 611 A.2d at 1180. However, the extent of the majority's agreement with the concurrence is not clear, and the concurrence proceeds to posit that meeting fewer than all five *Tarbert–Blouse* factors may constitute "substantial compliance," as well as suggesting a corollary movement toward an overarching totality-of-the-circumstances approach such as prevails in the context of suspicion-based seizures. *See* Concurring Opinion, at 485–86, 957 A.2d at 729 (Eakin, J.).

This, in my view, represents a departure from the essence of *Tarbert, Blouse,* and their progeny. In discussing the administrative requirements, the relevant portion of *Tarbert* (as adopted in *Blouse* ) clarifies that the roadblock "should" comply with each such factor, *see Blouse,* 531 Pa. at 172, 611 A.2d at 1180 (quoting *Tarbert,* 517 Pa. at 293, 535 A.2d at 1043), and this language has been adopted without change in later cases, *see Beaman,* 583 Pa. at 645–46 n. 9, 880 A.2d at 584 n. 9; *Yastrop,* 564 Pa. at 347, 768 A.2d at 323. Indeed, the requirement of prior administrative approval was further refined with the statement that "it is *essential* that the route selected for the roadblock be one which, based on local experience, is likely to be travelled by intoxicated drivers." *Blouse,* 531 Pa. at 172, 611 A.2d at 1180 (emphasis added). Moreover, the Court has maintained that *Blouse* approved the use of roadblocks "so long as they are conducted in conformance with the guidelines announced in *Tarbert.*" *Beaman,* 583 Pa. at 646–47, 880 A.2d at 585.[2]

2. The concurrence indicates that "[i]f all five factors must be met, this would be *'complete* compliance' with the guidelines, not merely *'sub-*

The special requirements articulated in this sharply-divided line of cases arose in light of the axiom that suspicionless searches and seizures "are highly disfavored since they dispense with the traditional rule that a search, if it is to be deemed reasonable, must be either supported by a warrant based on probable cause, or justified by evidence establishing individualized suspicion of criminal misconduct." *United States v. Amerson*, 483 F.3d 73, 77–78 (2d Cir.2007) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 451, 148 L.Ed.2d 333 (2000) (explaining that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing")). It was only in light of the compelling public interest in curbing impaired driving *and* the regulated character of the seizure that majorities were garnered to approve the privacy intrusions inherent in checkpoints against the serious constitutional challenges which were lodged. In my view, the suggestion of a movement away from firm enforcement of the *Tarbert–Blouse* criteria fosters uncertainty as to the Court's intent, invites further litigation to test the limits of the existing decisions, and is likely to lead to more dilution. Indeed, it is not difficult to envision these guidelines traveling the route of other judicial efforts to establish brighter-line rules designed to guard constitutional values. *See, e.g., Commonwealth v. Perez*, 577 Pa. 360, 374, 845 A.2d 779, 787 (2004) (abrogating the *Davenport/Duncan* six-hour rule pertaining to prompt arraignment in favor of a totality-of-the-circumstances approach).[3] Such a prospect is

*stantial* compliance' as *Blouse* requires." Concurring Opinion at 729 (emphasis in original). However, the premise that it is possible to assess substantial compliance with the factors only on a collective, as opposed to individual, basis, is faulty. Indeed, for my part I have always read the governing opinions as requiring substantial compliance with each requirement on an individual basis.

3. In *Perez*, I wrote:

I concur in the Court's abandonment of the "six-hour rule" governing the admissibility of a pre-arraignment confession as developed in *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977), and *Commonwealth v. Duncan*, 514 Pa. 395, 525 A.2d 1177 (1987), in favor of a totality-of-the-circumstances approach since, as noted by the majority, the six-hour rule has become so attenuated that it no longer can consistently and effectively serve its intended function.

492

most disquieting, since it is clear that, without the guidelines, the challenges to roadblocks raised under the Pennsylvania Constitution would have been sustained in the first instance. *See Blouse,* 531 Pa. at 173, 611 A.2d at 1180 ("We now adopt the guidelines set forth in *Tarbert,* because they achieve the goal of assuring that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.").

As a final matter, the Commonwealth argues in the alternative that suppression is not required.[4] It references *Commonwealth v. O'Shea,* 523 Pa. 384, 567 A.2d 1023 (1989), a decision that endorsed a case-by-case approach to suppression when an arrest was made in violation of the Municipal Police Jurisdiction Act. *See also Commonwealth v. Mason,* 507 Pa. 396, 490 A.2d 421 (1985) (adopting similar reasoning relative to minor infractions of the Rules of Criminal Procedure). The Commonwealth states that, "by analogy," the same circumstances-dependent rule should apply in the context of suspicionless seizures at sobriety checkpoints. *See* Brief for Appellant at 24. However, it has been the consistent practice of the courts in this Commonwealth to deem evidence obtained as the result of an unconstitutional search subject to suppression, *see Commonwealth v. Ruey,* 586 Pa. 230, 241, 892 A.2d 802, 808 (2006) (quoting *Commonwealth v. Gordon,* 546 Pa. 65, 71, 683 A.2d 253, 256 (1996)), and the Commonwealth does not identify any

See *Commonwealth v. Bridges,* 563 Pa. 1, 47, 757 A.2d 859, 883 (2000) (Saylor, J., concurring). This is, perhaps unfortunately, more often than not the experience with bright-line, judge-made rules having salutary underlying purposes, but which cause results in their implementation that are later deemed to be unpalatable.

*Perez,* 577 Pa. at 381–82, 845 A.2d at 792 (Saylor, J., concurring and dissenting). Speaking to the same subject in *Bridges,* I wrote: "Given the present holding [diluting the bright-line rule which governed prompt arraignment], I now favor [its] abandonment [over] continuation of a rule so readily capable of avoidance as to function as no rule at all; indeed, I believe that its maintenance on such terms carries with it the potential for diminishing respect for the courts' authority in the eyes of those subject to their lawful mandates." *Bridges,* 563 Pa. at 47, 757 A.2d at 883 (Saylor, J., concurring).

4. The majority declines to reach this issue in light of its holding. *See* Majority Opinion, at 477 n. 4, 957 A.2d at 724 n. 4.

authority that would suggest otherwise. As the Commonwealth recognizes, moreover, both *O'Shea* and *Mason* do not apply to instances in which "fundamental, constitutional concerns" are involved. Brief for Appellant at 23.

Although it is not entirely clear on this point, moreover, the Commonwealth appears to suggest that no such concerns are at issue because Appellee's rights were not violated by the specific way in which he was detained. However, the *Tarbert–Blouse* requirements are not concerned only with the manner in which an individual driver is stopped, but with ensuring that the sobriety checkpoint is conducted according to neutral, objective criteria so as to comply with the demands of the Constitution. Thus, because I am persuaded that the checkpoint failed to substantially comply with *Tarbert–Blouse*, I would find Appellee's detention unconstitutional. Finally, to the extent the Commonwealth avers that the police would have stopped Appellee even if they had not temporarily suspended the checkpoint, I find this contention of little relevance given my determination that the checkpoint was conducted in an unconstitutional manner.

Accordingly, as I would affirm the order of the Superior Court, I respectfully dissent.

Justice BAER joins this dissenting opinion.