123 A.3d 1060

**COMMONWEALTH of Pennsylvania, Petitioner,**

v.

**Cipriano GARIBAY, Respondent.**

Supreme Court of Pennsylvania.

Oct. 14, 2015.

*ORDER*

PER CURIAM

**AND NOW,** this 14th day of October, 2015, the Petition for Allowance of Appeal is **DENIED.**

Justice EAKIN files a dissenting Statement which is joined by Justice STEVENS.

Justice, EAKIN, dissenting.

I would grant allocatur to review the scope of the "guideline requirements" announced in *Commonwealth v. Tarbert,* 517 Pa. 277, 535 A.2d 1035 (1987) (plurality opinion), and *Commonwealth v. Blouse,* 531 Pa. 167, 611 A.2d 1177 (1992). *See generally Commonwealth v. Worthy,* 598 Pa. 470, 957 A.2d 720, 725 (2008).[1] While the decision below is certainly a fact-

1. [T]o be constitutionally acceptable, a checkpoint must meet the following five criteria: (1) vehicle stops must be brief and must not entail a physical search; (2) there must be sufficient warning of the existence of the checkpoint; (3) the decision to conduct a checkpoint, as well as the decisions as to time and place for the checkpoint, must

driven determination, the facts here are uniformly consistent with every checkpoint case. They are neither unique nor complicated, and this situation will undoubtedly recur with every checkpoint. My concern is with the criteria being applied to these facts, particularly application of the fourth factor (DUI frequency). Thus, I must dissent, as I would accept review herein.

I have long questioned the logic or purpose of this fourth factor—identifying "where and when intoxicated drivers are likely to be traveling[.]" *Id.*, at 725. The guidelines are connected to the constitutional concerns that are unquestionably involved with checkpoints. The other factors deal with brevity, no physical search, warning, administrative approval, objective standards, and precluding unfettered discretion of the officers—all designed to minimize the obtrusiveness of the process. However, the particular street on which drivers are traveling does not raise or lower the intrusiveness of stops; this factor deals with nothing but the past history of finding drunk drivers.[2]

The DUI-frequency factor has its roots in that very notion, the "success" of checkpoints. Initial constitutional challenges argued the checkpoints were a waste of money, and courts were asked to look to statistics of arrests to justify both the expense and the constitutional validity of the procedure. This argument was so pervasive that it, in turn, led to the fourth factor. While considering the past prevalence of DUI offenses may increase the likelihood someone will be caught in a given

be subject to prior administrative approval; (4) the choice of time and place for the checkpoint must be based on local experience as to where and when intoxicated drivers are likely to be traveling; and (5) the decision as to which vehicles to stop at the checkpoint must be established by administratively pre-fixed, objective standards, and must not be left to the unfettered discretion of the officers at the scene.

*Id.* (citation omitted) ("[S]ubstantial—and not complete—compliance with the guidelines is all that is required under *Tarbert–Blouse*.").

**2.** This factor is not analogous to high-crime areas, which can factor into a totality-of-the-circumstances analysis, *see, e.g., In re DM,* 566 Pa. 445, 781 A.2d 1161, 1164 (2001)—with checkpoints, everyone is stopped, and the specifics of the area do not affect anything.

checkpoint, it really does nothing whatsoever to minimize the constitutional invasiveness of the process or of the individual stop of any one person. The stop is exactly the same, regardless of where it happens, and constitutional protections do not vary based on how many criminals or intoxicated drivers are likely to be caught.

Besides, this factor misses the basic underlying purpose of the checkpoints; indeed, our case law has too often given short shrift to that consideration. The purpose of the checkpoint is not to catch violators; it is to deter people from becoming violators in the first place. *Blouse*, at 1179 ("[T]he risk of detection, both actual and perceived, will provide an effective deterrent to Motor Vehicle Code violations."). Advertising the checkpoint, the second factor, is embraced by law enforcement as the key to deterrence. Yet advertising would be silly if the purpose were apprehension. Operating the checkpoint based on the likelihood of apprehension really is a misguided notion, and making it a constitutional imperative, as did the Superior Court here, is, in my judgment, simply wrong and, at the least, worthy of our reconsideration.

What other purpose can there be for requiring the location and timing of a checkpoint to be based on where intoxicated drivers are likely to be traveling? If anything, a requirement that a checkpoint happen where it gets the most public notice is a more rational requirement.[3] Neither of these, however, have a single thing to do with minimizing the intrusiveness of the stop, which is, after all, the purpose of having the guidelines in the first place.

Whether the checkpoint was nominally for seatbelt use or DUI, the important part of the guidelines is objectivity in establishing and operating the checkpoint; eliminating unfettered discretion of officers is the real constitutional concern. Inflexible compliance with statistics about DUI likelihood seems an inappropriate requirement, and the likelihood of finding an area where motorists frequently fail to use seatbelts

3. The goal is for people to say, "I will not have that last drink—there's a checkpoint somewhere out there tonight." Doctrinal adherence to the factors in *Tarbert/Blouse* misses this point entirely.

seems aspirationally improbable; even if it were, there actually was evidence of high traffic and accident volume that made the location appropriate for this safety checkpoint. Again, linking site approval to statistical success, even for seatbelt violations,[4] does nothing to advance constitutional protections.

I appreciate the general judicial distaste for checkpoints, but our evaluation should reflect their true purpose, deterrence, and not by our very guidelines give gravitas to the notion that checkpoints ought to maximize the number of people caught. Accordingly, and respectfully, I would grant review to consider the practicality of strict compliance with the fourth of the *"Tarbert/Blouse* guideline requirements."

Justice STEVENS joins dissent.

---

4. The seatbelt statute itself cannot be merely looking to issue seatbelt tickets—it seeks compliance. *See* 75 Pa.C.S. § 4581(b) ("No person shall be convicted of a violation of subsection (a)(2)(ii) unless the person is also convicted of another violation of this title which occurred at the same time.").